[L.A. No. 32054. Dec. 23, 1985.]

Estate of MARY SANDERS, Deceased.
SARA SANDERS et al., Petitioners and Appellants, v.
FRANK C. SUTTON, as Executor, etc., Objector and Respondent.

608

**COUNSEL**

Richard J. Scuba for Petitioners and Appellants.

Thomas A. Henry, Jr., for Objector and Respondent.

**OPINION**

**BROUSSARD, J.**—Appellants, Sara Sanders and her sons Darren and David, appeal from an order of the Superior Court of San Diego County denying their motion to set aside the court's previous orders admitting the will of Mary Sanders to probate and ordering final distribution. Appellants moved to set aside the probate orders after they learned that respondent Frank Sutton, the executor, would inherit the bulk of the estate. Appellants allege that by concealment and misrepresentation Sutton prevented them from contesting the will within the statutory period. We conclude that appellants' allegations are sufficient to establish extrinsic fraud and we reverse the order.

I

The facts are undisputed.[1] In 1957, Mary Sanders suffered a "ruptured intracranial aneurysm" and was placed in an institution where she remained until her death on January 17, 1983. Her son, Gary Sanders, served as her conservator until his death in 1978. Respondent Sutton, Mrs. Sanders' nephew, was then appointed her conservator. At the time of respondent's appointment, Mrs. Sanders had a holographic will which left her entire estate to her son Gary. Sara Sanders,[2] Gary's widow, knew that under this will

---

[1]The facts are derived primarily from the affidavit of Sara Sanders submitted in the trial court. Respondent did not submit an affidavit of his own and has not denied appellants' factual assertions. He instead takes the position that even if appellants' declarations are accepted as true, they do not support a claim of extrinsic fraud. We are thus required for purposes of this appeal to accept the facts as uncontroverted.

[2]Hereinafter referred to as "Sara" in order to avoid confusion with the decedent, Mrs. Mary Sanders.

her sons would receive the entire estate by right of representation.[3] From the time of Sutton's appointment as conservator, he appeared to be very attentive to the boys' interests. He attempted, for example, to secure money to finance their educational and other expenses. Sara trusted Sutton completely.

In 1980, Sutton took his aunt to a meeting with his attorney, where Mrs. Sanders executed a will leaving him her one-third interest in a parcel of land in downtown San Diego.[4] This parcel is referred to by the parties as the "Market Street property." The probate referee appraised the one-third interest at $475,000 in 1983. The total value of Mrs. Sanders' estate at that time was fixed at $554,870. The will also named Sutton executor and trustee of a testamentary trust for Darren and David.[5]

After a memorial service for Mrs. Sanders on January 23, 1983, Sara initiated a conversation with Sutton in which they discussed Mrs. Sanders' will, her Market Street property, and the estate in general. Sara asked Sutton about the Market Street property, how the tax obligations were being paid and whether she or the boys would be responsible for any taxes or other expenses. Sutton did not respond to her specific inquiries, but repeatedly assured her that he would take care of everything and that she had no responsibilities in the matter. He also told her that he would work with the lawyer to guarantee that everything was handled properly and that she had no reason to call or contact his attorney, whom he had retained for the probate proceedings. Sutton told her not to worry or concern herself with the estate, he would see to it that everything was in order. He also told her that Mrs. Sanders' will had been put into "legal form" in order to avoid any problems in probate. He did not tell her that in putting the will into "legal form" the dispositive provisions had been revised so that he, rather than the boys, would inherit most of the estate. He again emphasized that if he or the attorney needed anything from her, they would contact her. On her drive home from the memorial service, Sara remembered thinking how knowledgeable Sutton was and how fortunate she and the boys were to have

---

[3]Although Sara was not a beneficiary under the holographic will, respondent does not object to her participation in this appeal along with her sons.

[4]By affidavit submitted in the trial court, Sutton's attorney declared that he prepared two wills for Mrs. Sanders, the first on December 11, 1978, and the second on November 21, 1980. The second will revoked the first. He claims that to the best of his knowledge "the decedent executed each will with an understanding of the size and extent of her estate and the natural objects of her bounty and was under no fraud, menace or distress at the time of such executions." The attorney's affidavit does not deny Sara's assertion that in 1978 Mrs. Sanders had a holographic will which left her entire estate to Darren and David. Nor does his affidavit deny any of appellants' assertions regarding Sutton's conduct.

[5]Darren and David were to receive 70 percent of the residue of the estate to be divided equally between them and held in trust by Sutton as trustee until both boys had reached the age of 30 and under various other terms and conditions.

him taking care of all the details. She was thankful that he was saving them from going through the same "trials and tribulations" they experienced after her husband's death five years before.

On February 9, 1983, Sutton filed a petition to probate the will and for letters testamentary. A formal notice of the death and of a hearing on Sutton's petition was mailed to and received by appellants. Upon receipt of the notice, Sara called Sutton and asked if it was necessary for her to do anything at that time. He again assured her that everything was fine—he and the lawyer were handling the matter, and the boys' interests were well represented. Appellants did not attend the hearing. On March 10, 1983, the court issued an order admitting the will to probate and appointing Sutton executor. The adoption of this order commenced the 120-day statutory period for a contest of the will. (See Prob. Code, § 380.)

In April 1983, appellants began receiving statements regarding the estate from the Bank of California. Sara was surprised to see that the Market Street property was not listed. She wrote a letter to Sutton thanking him for his "kindness" and requesting that he send any information he had on the Market Street property. She asked why the property did not appear on the financial statements received from the bank. She also specifically asked whether the property had been sold and, if not, what effect the Gas Lamp Quarter redevelopment project in downtown San Diego would have on the property.[6] Sutton did not reply to the letter.

In July 1983, Sara again attempted to contact Sutton, this time by telephone. The call was not returned. In September 1983, she tried calling Sutton both at his office and at his home. He was never present at either location when she called and never responded to her messages to call her. Sara and her son Darren attempted to contact Sutton on three subsequent occasions without success. Their calls were not returned. Sara still trusted Sutton at this point and was concerned that he might be insulted by her repeated requests for information on the Market Street property.

Sutton filed a final account and petition for distribution on January 11, 1984. A hearing on the petition was scheduled for February 1, 1984. Sara received notice of the hearing on January 24, 1984. She did not recognize the names of several of the intended beneficiaries. The notice also indicated that all taxes and fees were due and payable as of March 1, 1984. Sara still had not heard from Sutton and became concerned about the obligations the

---

[6]In his affidavit submitted to the trial court, Sutton's attorney noted that the creation of the Gas Lamp Redevelopment District had "undoubtedly increased the value of the interest [in the Market Street property]."

probate proceeding might place on her and the children. She still had confidence in Sutton, however, and did not want to hurt his feelings by questioning the lawyer before discussing the matter directly with him. She called Sutton the day after receiving the notice, apparently at his office. The receptionist hung up on her.

Sara finally succeeded in contacting Sutton on January 26, 1984. He told her there was no need for her to attend the hearing. He assured her there would be "no problems." Although she asked him repeatedly about the Market Street property, he was evasive in his answers. After the fourth inquiry, Sutton admitted that he had had Mrs. Sanders change her will to leave the property to him. He told her there was nothing she could do about it now. Sara immediately contacted an attorney.

Counsel for appellants appeared at the February 1 hearing to orally contest the petition. Appellants argued that they had learned only four days before the hearing that the will being probated was the one drafted by Sutton's attorney in 1980, and that the bulk of the estate would go to him. They argued that Sutton's misrepresentations and concealment had prevented a timely contest of the will and constituted extrinsic fraud. The court rejected appellants' contest and entered a decree of final distribution awarding Sutton the interest in real property and net rentals, worth a total of $496,780. Darren and David each received $11,410, to be held in trust by Sutton as trustee until each boy reached the age of 30. Sara received $4,890.

On February 14, 1984, appellants moved to set aside the order admitting the will to probate and the order of final distribution. Appellants again claimed such orders had been obtained by extrinsic fraud. The court denied appellants' motion after a hearing held on March 7, 1984. A formal order was adopted on March 29, 1984, which included findings that appellants had not shown extrinsic fraud and that no other reason supported setting aside the orders.

On appeal, appellants contend that respondent maintained a confidential and fiduciary relationship with them which placed upon him a duty to disclose all material facts concerning the estate. They argue respondent breached his duty by concealing and misrepresenting the facts, and that such breach is fraudulent as a matter of law. Appellants also claim that respondent's conduct constitutes extrinsic fraud since by his silence and deception he kept them from discovering the true nature of the will offered for probate and thereby prevented a timely contest.

## II

The probate of a will is conclusive if not contested within 120 days after the will is admitted to probate. (Prob. Code, § 380.) ▪ Even in the

absence of a timely contest, however, a court may exercise its equitable jurisdiction to set aside orders and decrees of probate proceedings in cases of fraud or mistake. (*Estate of Charters* (1956) 46 Cal.2d 227, 234 [293 P.2d 778]; *Caldwell* v. *Taylor* (1933) 218 Cal. 471, 475 [23 P.2d 758]; *Bacon* v. *Bacon* (1907) 150 Cal. 477, 481 [89 P. 317]; *Baker* v. *O'Riordan* (1884) 65 Cal. 368, 370 [4 P. 232].) ■ It is well settled, however, that "only upon proof of *extrinsic* and *collateral* fraud can plaintiff seek and secure equitable relief from the judgment. A showing of fraud practiced in the trial of the original action will not suffice." (*Caldwell, supra,* 218 Cal. at p. 476.) The courts have required a showing of extrinsic fraud in order to accommodate both the policy in favor of resolving issues in a final judgment and the policy in favor of a fair adversary proceeding in which each party is provided an opportunity to fully present its case. (*Ibid.; Estate of Charters, supra,* 46 Cal.2d at pp. 234-235.)

The seminal definition of extrinsic fraud is found in *United States* v. *Throckmorton* (1878) 98 U.S. 61, 65-66 [25 L.Ed. 93, 95]: "Where the unsuccessful party has been prevented from exhibiting fully his case, by fraud or deception practised on him by his opponent, as by keeping him away from court, a false promise of a compromise; or where the defendant never had knowledge of the suit, being kept in ignorance by the acts of the plaintiff; or where an attorney fraudulently or without authority assumes to represent a party and connives at his defeat; or where the attorney regularly employed corruptly sells out his client's interest to the other side, these, and similar cases which show that there has never been a real contest in the trial or hearing of the case, are reasons for which a new suit may be sustained to set aside and annul the former judgment or decree, and open the case for a new and fair hearing. [Citations.] [¶] In all these cases, and many others which have been examined, relief has been granted, on the ground that, by some fraud practised directly upon the party seeking relief against the judgment or decree, that party has been prevented from presenting all of his case to the court."

We recently observed that "[e]xtrinsic fraud is a broad concept that 'tend[s] to encompass almost any set of extrinsic circumstances which deprive a party of a fair adversary hearing.'" (*In re Marriage of Modnick* (1983) 33 Cal.3d 897, 905 [191 Cal.Rptr. 629, 663 P.2d 187], quoting from *In re Marriage of Park* (1980) 27 Cal.3d 337, 342 [165 Cal.Rptr. 792, 612 P.2d 882].) The clearest examples of extrinsic fraud are cases in which the aggrieved party is kept in ignorance of the proceeding or is in some other way induced not to appear. (5 Witkin, Cal. Procedure (2d ed. 1971) Attack on Judgment in Trial Court, § 184, pp. 3752-3753.) In both situations the party is "fraudulently prevented from presenting his claim or defense." (*In*

re Marriage of Modnick, supra, 33 Cal.3d at p. 905; see also 5 Witkin, Cal. Procedure, supra, § 184, p. 3753.)

The courts are particularly likely to grant relief from a judgment where there has been a violation of a special or fiduciary relationship. ■ ■ ■ ■ The commentators have observed that breach of a fiduciary duty may warrant setting aside the judgment even though the same conduct in a nonfiduciary relationship would not be considered extrinsic fraud.[7] (See Freeman, Judgments, supra, § 1235, pp. 2575-2576; Moore, Moore's Federal Practice (2d ed. 1948) [¶] 60.37.[1], p. 614; Comment, Seeking More Equitable Relief From Fraudulent Judgments: Abolishing the Extrinsic-Intrinsic Distinction (1981) 12 Pacific L.J. 1013, citing above at p. 1021, fns. 65-66.)

Appellants maintain that Sutton's relationship with them was one of both confidant and fiduciary.[8] ■ It is well settled that "[a] confidential relationship exists when one party gains the confidence of the other and purports to act or advise with the other's interests in mind; it may exist although there is no fiduciary relationship; it is particularly likely to exist when there is a family relationship or one of friendship." (Kudokas v. Balkus (1972) 26 Cal.App.3d 744, 750 [103 Cal.Rptr. 318]; see also Vai v. Bank of America (1961) 56 Cal.2d 329, 337-338 [15 Cal.Rptr. 71, 364 P.2d 247].) It has been more succinctly said that "[a] confidential relationship exists when trust and confidence are reposed by one person in the integrity and fidelity of another." (Nicholson v. Rose (1980) 106 Cal.App.3d 457, 462 [165 Cal.Rptr. 156].) It is not necessary "that there be an extended period of business or accommodation transactions or dealings between persons in order for a confidential relationship to be established between them." (Pryor v. Bistline (1963) 215 Cal.App.2d 437, 446 [30 Cal.Rptr. 376].)

■ Sara's uncontroverted affidavit reveals that from the time Sutton was appointed to replace her husband as conservator, she relied on him to protect the boys' interests. Since Sutton was a member of the family and

---

[7]"The failure to perform the duty to speak or make disclosures which rests upon one because of a trust or confidential relationship is obviously a fraud for which equity may afford relief from a judgment thereby obtained, even though the breach of duty occurs during a judicial proceeding and involves false testimony and this is true whether such fraud be regarded as extrinsic or as an exception to the extrinsic fraud rule.[fn.1]" (Freeman, Judgments (5th ed. 1925) § 1235, p. 2576.)

[8]Without argument, respondent simply declares that "[a]s conservator of the Estate of Mary Sanders, the Respondent was in no confidential or fiduciary relationship with [Appellants]." Respondent ignores the obligations arising from the relationship which developed between him and appellants both before and after Mrs. Sanders' death, and the fiduciary duties arising from his position as executor. He does not explain how his position as conservator precluded a confidential and fiduciary relationship with appellants.

purported to act on the boys' behalf, her reliance was reasonable. Sutton must also have been aware of Sara's trust and confidence in his representation given her regular inquiries regarding the Market Street property and the boys' obligations and responsibilities under the will. In view of Mrs. Sanders' prior holographic will leaving her entire estate to the boys, Sutton could not have escaped notice of the significance of this trust. These facts clearly show the existence of a confidential relationship.

Sutton's confidential relationship with appellants required that he not mislead them as to the will he had filed for probate. ■ " 'Where there exists a relationship of trust and confidence it is the duty of one in whom the confidence is reposed to make full disclosure of all material facts within his knowledge relating to the transaction in question and any concealment of material facts is a fraud.' " (*Estate of Shay* (1925) 196 Cal. 355, 365 [237 P. 1079]; *Martin* v. *Martin* (1952) 110 Cal.App.2d 228, 233 [242 P.2d 688]; *Main* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.* (1977) 67 Cal.App.3d 19, 32 [136 Cal.Rptr. 378].) " 'Where there is [such] a duty to disclose, the disclosure must be full and complete, and any material concealment or misrepresentation will amount to fraud sufficient to entitle the party injured thereby to an action.' " (*Stafford* v. *Shultz* (1954) 42 Cal.2d 767, 777 [270 P.2d 1]; *Main* v. *Merrill Lynch, supra.*)

In addition to the obligations arising from the confidential relationship, Sutton bore a fiduciary duty to appellants by virtue of his position as executor of Mrs. Sanders' estate. ■ An executor " 'is an officer of the court and occupies a fiduciary relation toward all parties having an interest in the estate.' " (*Larrabee* v. *Tracy* (1943) 21 Cal.2d 645, 650 [134 P.2d 265], quoting from *Estate of Conkey* (1939) 35 Cal.App.2d 581, 585 [96 P.2d 383].) " 'Executors occupy trust relations toward the legatees, and are bound to the utmost good faith in their transactions with the beneficiary. . . .' " (*Larrabee* v. *Tracy, supra,* 21 Cal.2d at p. 651, quoting from *Bacon* v. *Bacon, supra,* 150 Cal. at p. 489.) An executor also bears a "duty to disclose all the facts . . . and to refrain from taking an unfair advantage of [the legatees]." (*Blair* v. *Mahon* (1951) 104 Cal.App.2d 44, 49 [230 P.2d 832].)

■ Applying these principles here, it is evident that respondent violated his confidential and fiduciary relationship with appellants through a consistent course of concealment and misrepresentation. Sutton never disclosed to appellants that he had arranged for the execution of a new will substituting himself for the boys as the major beneficiary of the Sanders estate. He now asserts that he would have violated his duties as conservator had he informed appellants of the new will without Mrs. Sanders' consent. However, even after Mrs. Sanders' death, a time when he owed appellants a duty to disclose

all material facts, he continued to conceal the fact that the new will substantially affected appellants' interests in the estate.

Sutton not only failed to reveal the nature of the changes made in Mrs. Sanders' will, his representations appear calculated to leave the impression that appellants' interests had *not* been affected by the changes. Sutton told Sara that Mrs. Sanders' previous will had been put into "legal form" simply to avoid problems in probate. He did not mention that the revision served the added purpose of insuring that he would inherit the Market Street property at the boys' expense. Had Sutton any doubts that Sara believed the boys remained as primary beneficiaries, such doubts should have been dispelled by her persistent inquiries regarding the central asset of the Sanders estate. Sara's questions about the absence of the Market Street property from the financial statements, the possible changes in the value of the property, and the tax obligations she and the boys might incur, clearly presuppose a bequest of the property. Sutton made no effort to disabuse her of this view. Instead, he either evaded her inquiries altogether, or reassured her that everything was in order and that he was protecting the boys' interests.

By misrepresentation and concealment Sutton led appellants to believe their interests in the estate remained unchanged. The objectives of his deception are apparent. He told Sara on more than one occasion that he would take care of everything and that she had no reason to contact the attorney who was handling the probate proceedings. He repeatedly emphasized that she had no responsibilities in the matter and that he would contact her if her involvement was necessary. He specifically told her she need not attend the hearing on the petition for final distribution. This conduct seems clearly intended to prevent appellants from appearing to contest the will.

In *Larrabee* v. *Tracy, supra,* 21 Cal.2d 645, the executor led a beneficiary to believe she would receive her mother's share of the estate by right of representation. Without notifying the beneficiary of his change in position, the executor asked the probate court to distribute the legacy to himself. In a unanimous decision authored by Chief Justice Gibson, this court held that the conduct constituted extrinsic fraud. "[The executor's] conduct effectively prevented Mrs. Larrabee from obtaining a fair adversary hearing and, in our opinion, affords ample justification for the granting of equitable relief. As executor of the estate and its residuary legatee appellant had a clear duty to refrain from taking an unfair advantage of the impression he had created." (*Id.,* at p. 650.)

Sutton's conduct is also similar to that at issue in *Craney* v. *Low* (1956) 46 Cal.2d 757 [298 P.2d 860]. In that case, plaintiff was the elderly mother of the decedent. Defendant, the decedent's widow, told plaintiff that she

need not retain an attorney because defendant would keep plaintiff informed of the probate proceedings and would do everything possible to protect her interests in the estate. This court found the allegations sufficient to show extrinsic fraud even though defendant was not executor and did not owe plaintiff a fiduciary duty in that capacity. The court implicitly relied solely on the breach of a confidential relationship. "Sufficient facts are alleged to show that plaintiff relied upon the representations made by [defendant] and that the deception practiced on her prevented her appearance in the probate proceedings." (*Id.*, at p. 759.)

The facts of this case are also not unlike the facts in *Duffy* v. *Duffy* (1947) 82 Cal.App.2d 203 [186 P.2d 61]. In that case the decedent left a will devising his entire estate to a minor nephew and niece. The decedent's brother, who was also the uncle of the beneficiaries, was appointed executor. The minor beneficiaries alleged that the uncle represented to their mother that he would take care of everything and would protect their interests in the estate. Instead he presented an adverse claim. The court noted that the uncle bore a fiduciary duty to the minor beneficiaries as a member of the family, as trustee of a testamentary trust created by the decedent for the beneficiaries, and as executor of the estate—the same relationships alleged by appellants in the present case. The court held that "the nephew and niece, by reason of the blood and other confidential relationships, had the right to rely upon their uncle's representation that he would take care of their interests in the estate. It was those representations that kept them from appearing in the estate, and if, as alleged, they were false, it constitutes extrinsic fraud." (*Id.*, at p. 208.)

In the present case, respondent argues that he fulfilled his responsibilities by ensuring that the estate was administered in an orderly manner and that appellants received all legal notices. He claims appellants never requested to see a copy of the will and that "it isn't the duty of the Executor to see that distributees under a will get all that they think they should have received or that they were expecting to receive."[9]

---

[9]Respondent cites only *Stevens* v. *Torregano* (1961) 192 Cal.App.2d 105 [13 Cal.Rptr. 604] in support of his argument. To the extent that case is relevant, it is directly contrary to respondent's position. In *Stevens,* the plaintiff alleged that she was a pretermitted heir of the decedent and that the defendant, a legatee under the will, concealed her identity from the executor. The court found that the defendant had not committed extrinsic fraud. It observed that under settled law a legatee is not under a duty to notify other heirs of the decedent's death or of the probate proceedings. (*Id.*, at p. 123.) The court also noted that plaintiff had not alleged that defendant had ever been asked about the existence of other heirs. (*Id.*, at pp. 119, 125.) Most importantly for our case, the court found no allegations of a confidential or fiduciary relationship which would have placed a duty on the defendant to make a full disclosure. (*Id.*, at pp. 123-124.)

The court also found that the executor had fulfilled its duties. The court noted that the

Respondent's argument may be based on his erroneous view that he was not in a confidential or fiduciary relationship with appellants. It is clear that where such relationships exist, and where the fiduciary has led the aggrieved party to believe that his interests will be protected, receipt of legal notice of the proceeding will not preclude equitable relief. The aggrieved party has a right to rely on the trust created by the special relationship and may assume that the fiduciary will abide by his duty to act in good faith.

In summary, appellants' undisputed affidavit shows that respondent led them to believe the will offered for probate would leave the entire estate to them. He concealed the fact that he had arranged for the decedent to change her will to leave most of the estate to him. He also assured appellants that he would represent their interests. Relying on their confidential and fiduciary relationship, appellants were lulled into a sense of security by respondent's representations. As if to insure the success of his plan, respondent expressly told appellants that they need not become involved in the probate proceedings and advised them not to contact the probate attorney. These allegations, if true, clearly show extrinsic fraud.

The order is reversed and the cause remanded to the trial court for further proceedings in accordance with this opinion.

Bird, C. J., Mosk, J., Reynoso, J., Grodin, J., Lucas, J., and Kaus, J.,* concurred.

On March 13, 1986, the opinion was modified to read as printed above.

---

executor had provided all notices required by law. An executor has no duty to search out unknown heirs. (*Id.*, at p. 122.) It is also generally accepted that ignorance on the part of an executor of the existence of an heir does not constitute extrinsic mistake. (*Ibid.*) The court concluded, however, that plaintiff would have been entitled to equitable relief had she alleged that the executor knew of her existence. "This is because the executor is a fiduciary, and silence on the part of a fiduciary, who is under a duty to speak, is fraud." (*Id.*, at p. 123.)

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairperson of the Judicial Council.