Filed 7/27/21

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| HUY FONG FOODS, INC., | 2d Civ. No. B303096 |
| | (Super. Ct. No. 56-2017- |
| Plaintiff, Cross-defendant, and Appellant, | 00505141-CU-BC-VTA) |
| | (Ventura County) |
| v. | |
| UNDERWOOD RANCHES, LP, | |
| Defendant, Cross-complainant and Appellant; | |
| UNDERWOOD & SON, LLC, | |
| Cross-Complainant and Respondent; | |
| DAVID TRAN, | |
| Cross-defendant and Respondent. | |

     It has been said that some contracts are not worth the paper they are written on. But oral contracts stemming from previous written contracts and long-standing business practices

based on custom and trust are as valid as contracts that are worth the paper they are written on.  When such a contract is breached, there are consequences.

A pepper farmer sued the manufacturer of a pepper-based hot sauce for breach of contract and fraud.  A unanimous jury found for the farmer, awarding $13.3 million in compensatory damages and $10 million in punitive damages.  We affirm the judgment.

FACTS

David Tran founded Huy Fong Foods, Inc. (Huy Fong), a business that produces Sriracha, a jalapeño pepper-based hot sauce.  In 1988, Huy Fong contracted with Underwood Ranches, L.P. (Underwood) to purchase 500 tons of jalapeños from Underwood.  Craig Underwood (Craig) is Underwood's principal.  This was the beginning of a relationship that would last for 28 years.

For the first 10 years, the parties executed written agreements specifying the price per pound and volume to be supplied.  Thereafter, the parties dealt with each other informally with oral agreements.  Originally, Huy Fong needed more peppers than Underwood could supply, so it contracted with other farmers as needed.

Underwood's pepper sales to Huy Fong grew along with the success of Huy Fong's business.  Craig testified that, by 2005, Tran was "pushing" Underwood to add more acreage.

In 2006, Tran asked Underwood to significantly increase its pepper acreage.  Underwood was growing 95 percent of Huy Fong's peppers.  But the peppers represented only 25 percent of Underwood's business.  Underwood also farmed diverse crops such as lemons and vegetables.  Craig told Tran that he was

2.

reluctant to assume the risk of growing more peppers, and rejected Huy Fong's offer.  Craig suggested that Huy Fong supplement Underwood's crop with peppers from other sources.

Instead of seeking other sources, Huy Fong proposed that it would assume some of the risk.  Huy Fong would pay Underwood by the acre grown instead of pounds produced.  Thus, the risk of a disappointing yield would be on Huy Fong.  Underwood agreed to the arrangement.

In 2007, Huy Fong advised Underwood to increase its acreage by 50 percent.  To do this, Underwood had to expand its operations from Ventura County to Kern County.  Craig testified that the expansion into Kern County was the biggest thing he had ever done, but he needed to do it to meet Huy Fong's increasing needs.

At the same time, Huy Fong was building a 600,000-square-foot factory in Irwindale.  Tran took Craig on a tour of the site.  Tran told Craig that Underwood "needed to fill it up."  Tran told Craig that he should be farming at least 2,000 acres.

Due to Tran's suggestion and encouragement, Underwood invested millions of dollars in acquiring additional acres in Kern County and, to a lesser extent, Ventura County.  By the end of the 2016 growing season, Underwood had acquired over 1,800 acres in Kern County.  It took a year or more to prepare the ground for growing peppers.  Many of the leases extended into the 2020's, 2030's, and beyond.  By 2016, Huy Fong accounted for approximately 80 percent of Underwood's revenue.

Underwood made these investments because Tran and Donna Lam, Huy Fong's chief operations officer and Tran's sister-in-law, assured Underwood that Huy Fong would continue to purchase the peppers grown by Underwood into the future.  Craig

testified Tran and Lam made sure he knew Huy Fong was going to take all the product Underwood would produce. They repeatedly told Craig, "You grow it, I'll sell it."

### Huy Fong Video Records 2016 Harvest

Craig, along with Underwood's chief operations officer, Jim Roberts, developed a mechanical harvester for the peppers. The 2016 harvest was the first time the entire harvest was performed by the harvester. Mechanical harvesting saved substantial money.

In October 2016, Tran requested Underwood's permission to take video footage from an aerial drone of Underwood's harvesting and sorting operations. Roberts granted permission for Huy Fong's personal use only. Huy Fong had never before requested to record the harvest.

### Chilico, LLC

In 2014 or 2015, Tran formed a new company that he later called Chilico, LLC. Chilico's purpose was to obtain peppers for Huy Fong. In May 2015, Tran offered Roberts a job. Roberts declined the job offer and attributed the offer to a mistake.

Tran officially formed Chilico in 2016. He gave 100 percent ownership to his sister-in-law Lam. Tran testified that he wanted to give Lam a significant salary increase, but his son and wife, who were on Huy Fong's board, would object.

Huy Fong contracted with Chilico to buy all its chilies peppers from Chilico. The contract diverted millions of dollars from Huy Fong to Chilico.

### 2017 Contract

On November 1, 2016, Craig, Roberts, Tran, and Lam met at the Huy Fong factory to plan for the 2017 pepper season. The parties discussed ongoing field preparations for the upcoming

season. Underwood was already preparing the ground. Because it is a continuous process, Underwood could not wait.

Underwood and Huy Fong agreed that for the 2017 season Underwood would plant 1,700 acres for $13,000 per acre. Tran also agreed to advance payments of $18 million.

*Breach of Contract*

On November 9, 2016, Lam asked Roberts to come to the Huy Fong factory to pick up some equipment. Lam and Tran knew Craig was on vacation and would not accompany Roberts.

When Roberts arrived, Tran told him that he was forming a new company. Lam was going to operate the company. Tran told Roberts that Roberts would be working for the new company.

When Roberts declined the job offer, Tran was not happy. Tran told Roberts that Underwood would have to deliver peppers for $500 per ton to compete with Chinese pepper mash that sold for $300 per ton. When Roberts told Tran that Craig makes the decisions for Underwood, Tran replied that he would make Craig take $500 per ton.

Underwood was suddenly facing imminent catastrophic financial consequences. It could not grow peppers for $500 a ton. Its costs averaged $610 a ton.

Further negotiations with Huy Fong proved unfruitful. Lam insisted that Huy Fong needed to purchase peppers for under $500 per ton. Tran refused to provide Underwood with prepayments needed to finance the crop. Tran also insisted that Underwood contract with Chilico rather than Huy Fong. Chilico did not have the assets to ensure that Underwood would be paid and Huy Fong refused to guarantee the Chilico contract.

Tran made a final attempt to hire Roberts away from Underwood.

In early January 2017, Craig sent an e-mail to Tran stating that in October 2016 they had an agreement to move ahead with production for 2017; subsequently, Huy Fong decided to change the agreement; and it is impossible for Underwood to comply with the modified terms. The e-mail advised Huy Fong that the start date for planting had passed, there were no plants in the nursery, and Underwood did not plan on delivering any peppers to Huy Fong.

Huy Fong contracted with other farmers to provide peppers. Tran showed those farmers the drone video of Underwood's 2016 harvest that he had promised to keep confidential to show them how to harvest economically.

*Consequences of Huy Fong's Breach*

After the relationship with Huy Fong ended, Underwood had nothing to plant on the 1,700 acres it had. Nor did Underwood have the financing to plant acreage on speculation. It tried to get out of its leases, but was largely unsuccessful. It had to immediately lay off 40 employees. It was too late in the season to grow much of anything.

Underwood managed to obtain subcontracts for spring and summer, but it lost 8.5 million in 2017. Underwood was having difficulties in 2018, and lost over $6 million that year.

Roberts explained that with two or three years' notice, Underwood could have avoided the losses. He testified: "[W]e would have compressed the acreage on the peppers. We wouldn't have worried about the [crop] rotation. I could have shed property at the same time as growing peppers and generated revenue from those. It would have given me–that entire first year when we had absolutely nothing to grow, that would have been covered. So, that massive loss in the first year would have

6.

been eliminated.  And in the second year, we would be taking on new customers.  Then if we could work it out, reduce our pepper acres, add the new acres of other crops, it might have been seamless.  Might not have had any loss."

Roberts testified that growing peppers for Huy Fong required planning three years ahead of time.

*Procedure*

Huy Fong brought an action against Underwood seeking a $1.4 million refund of payments Huy Fong had made for the 2016 season.

Underwood cross-complained alleging breach of contract, promissory estoppel, and fraud against Huy Fong, and intentional interference with prospective economic relations and intentional interference with contractual relations again Tran.

The trial court granted Tran judgment of nonsuit on the tortious interference claims.

*Verdict*

The jury unanimously found in Underwood's favor on breach of contract and fraud.  The jury awarded Underwood $13.32 million in compensatory damages and $10 million in punitive damages.  The trial court denied Huy Fong's motion for judgment notwithstanding the verdict.[1]

---

[1] Huy Fong's motion to supplement the record on appeal, filed April 22, 2020, is denied.

DISCUSSION

*Huy Fong's Appeal*

I

*Fraud*

Huy Fong contends it is entitled to judgment on Underwood's fraud claim.

Huy Fong argues that Underwood prevailed on a legally impermissible theory of fraudulent concealment. Huy Fong mischaracterizes Underwood's theory. Huy Fong claims Underwood's theory is that "*every* party to a contract–solely by virtue of the contract's existence–has a freestanding state-law duty to disclose to its counterparty any intention to discontinue the contractual relationship."

Having mischaracterized Underwood's theory, Huy Fong cites *Norkin v. United States Fire Ins. Co.* (1965) 237 Cal.App.2d 435, to show why the theory it falsely attributes to Underwood is wrong.

In *Norkin*, plaintiff made a claim against his homeowner's insurer. Thereafter, the insurer refused to renew the policy. Plaintiff brought an action for fraud against the insurer alleging the insurer failed to disclose it would not do further business with plaintiff if he made a claim. The trial court sustained the insurer's demurrer without leave to amend. The Court of Appel affirmed, stating the insurer was under no duty to disclose its intention not to renew. (*Norkin v. United States Fire Ins. Co., supra*, 237 Cal.App.2d at p. 438.)

Underwood's theory is not that every contract requires a party to disclose an intention not to renew. Instead, Underwood's theory is that Huy Fong induced Underwood to acquire more and more land by continually promising Underwood that Huy Fong

8.

would purchase all the peppers Underwood produced.  Huy Fong understood that it was inducing Underwood to commit itself into the future, while at the same time concealing its plan to terminate its relationship with Underwood.

Had the insurer in *Norkin* induced plaintiff to purchase his house on the fraudulent promise that it would continue to insure it, we are confident the result would have been different.

More to the point, the question on appeal is not whether the judgment can be upheld on a particular legal theory, but whether the judgment can be upheld on any legal theory.  (See, e.g., *International etc. Workers v. Landowitz* (1942) 20 Cal.2d 418, 423 [judgment entered on grounds that ordinance is unconstitutional upheld on other grounds].)

### (a)  Fraudulent Concealment

Huy Fong contends it had no duty to disclose that it did not intend to continue its contractual relationship with Underwood

Fraudulent concealment requires the "suppression of a fact, by one who is bound to disclose it."  (Civ. Code, § 1710, subd. 3.)  Plaintiff must show that defendant had a duty to disclose.  (*Linear Technology Corp. v. Applied Materials, Inc.* (2007) 152 Cal.App.4th 115, 131.)

A duty to disclose may arise from a confidential relationship.  Where there exists a relationship of trust and confidence, it is the duty of one in whom the confidence is reposed to make a full disclosure of all material facts within his knowledge relating to the transaction in question and any concealment of a material fact is a fraud.  (*Estate of Sanders* (1985) 40 Cal.3d 607, 616.)  A confidential relationship can exist even though, strictly speaking, there is no fiduciary relationship.  (*Id.* at p. 615.)  A confidential relationship may be founded on

9.

moral, social, domestic, or merely a personal relationship. (*Barbara A. v. John G.* (1983) 145 Cal.App.3d 369, 382.)

In *Bank of America v. Sanchez* (1934) 3 Cal.App.2d 238, 243, the court stated, "[I]t is sufficient to show the existence of such friendly relations during a period of several years between the parties as would entitle the injured person to place confidence in the integrity and honesty of the other party to a contract . . . ." The court determined that a customer's business relationship with a bank over a period of years, her husband's former employment with the bank, and her acquaintance with and confidence in officers of the bank were substantial evidence of a confidential relationship. (*Ibid.*)

Here the parties' relationship extended over 28 years. Tran testified his relationship with Craig was like a family, that he trusted Craig, and saw him as a good friend. Lam described the relationship between Underwood and Huy Fong as a "concrete bond." The parties shared financial information. Craig obtained more land in reliance on Huy Fong's assurance that it would buy what Underwood produced. Perhaps the most compelling evidence of a confidential relationship is that for many years the parties entered into transactions involving tens of millions of dollars without formal written contracts.

Huy Fong points out that the jury was instructed on fraudulent concealment, but the instruction did not include confidential relationship.

If this was error, it is patently harmless. The evidence that Underwood and Huy Fong were in a confidential relationship is overwhelming. Even Huy Fong concedes in its opening brief that the parties had enjoyed a "close and friendly" relationship, that the parties "successfully collaborated for decades," that the

10.

relationship grew less formal as the parties "drew closer," and that they "shared the financial burdens and risks of jalapeño cultivation." Huy Fong does not even suggest any contrary evidence.

Huy Fong argues the concealed information must be fact not intention. But again the authority Huy Fong cites does not support the argument. The cases Huy Fong cites do involve a concealment of fact but none of them hold a concealment of intention is not sufficient. (See, e.g., *Hoffman v. 162 North Wolfe LLC* (2014) 228 Cal.App.4th 1178 [cited by Huy Fong; does not involve concealment of intention].)

Here Huy Fong's decision to terminate its relationship with Underwood was not some inchoate idea. Huy Fong's business required a dependable supply of peppers. Huy Fong made the decision to terminate its relationship with Underwood long before the end of the 2016 harvest. That decision was a "fact" that Huy Fong had a duty to disclose to Underwood. And the jury had ample evidence to so find.

### (b) Affirmative Misrepresentation

Huy Fong contends there is no evidence of an affirmative misrepresentation.

In viewing the evidence, we look only to the evidence supporting the prevailing party. (*GHK Associates v Mayer Group, Inc.* (1990) 224 Cal.App.3d 856, 872.) We discard evidence unfavorable to the prevailing party as not having sufficient verity to be accepted by the trier of fact. (*Ibid.*) Where the trial court or jury has drawn reasonable inferences from the evidence, we have no power to draw different inferences, even though different inferences may also be reasonable. (*McIntyre v. Doe & Roe* (1954) 125 Cal.App.2d 285, 287.) The trier of fact is

not required to believe even uncontradicted testimony.  (*Sprague v. Equifax, Inc.* (1985) 166 Cal.App.3d 1012, 1028.)

One who willfully deceives another with intent to induce him to alter his position to his injury or risk is liable for any damage that he thereby suffers.  (Civ. Code, § 1709.)  A promise to do something necessarily implies an intention to perform; hence, when a promise is made without such an intention, it is fraud.  (*Lazar v. Superior Court* (1996) 12 Cal.4th 631, 638.)

Huy Fong points out that the only fraud Underwood alleges in its complaint is a July 2016 representation that Huy Fong would purchase peppers from Underwood for the 2017, 2018, 2019 pepper seasons and beyond.  Huy Fong argues that at best there was an implied promise based on vague reassurances of good feelings between the parties.  Huy Fong cites *Lonely Maiden Productions, LLC v. Golden Tree Asset Management, LP* (2011) 201 Cal.App.4th 368, 375, for the proposition that California does not recognize a fraud claim based on an implied false promise.

But *Lonely Maiden* cites no authority for the proposition that fraud cannot be based on an implied false promise.  Where the implied promise is certain enough to cause reasonable reliance, there is no reason it cannot be a proper basis for fraud. Parties may not avoid liability for fraud simply because they leave to implication what they clearly intend to communicate.

In any event, here there was far more than an implied promise based on vague reassurances of good feelings between the parties.  Huy Fong expressly told Underwood numerous times that Huy Fong would purchase all the peppers Underwood could produce.  These promises were made in the context of Huy Fong's insistence that Underwood obtain more land, a matter that required Underwood to undertake long-term financial

12.

commitments.  In addition, Huy Fong expressly agreed to purchase the 2017 harvest of 1,700 acres at $13,000 per acre.

The jury could reasonably conclude that Huy Fong had no intention of keeping those promises when they were made.  There is evidence to show that Tran had long planned to cut Huy Fong's ties to Underwood.  As far back as 2014, Tran was planning to form Chilico, a company that would purchase peppers from farmers other than Underwood, allowing Huy Fong to cut its ties to Underwood.  In 2015, Tran began his campaign to hire Roberts away from Underwood.  Roberts was the key employee in Underwood's pepper production.  Tran informed Roberts that Huy Fong was breaching the contract to purchase Underwood's 2017 harvest just days after making it.  Tran waited until he knew Craig was on vacation before informing Roberts.  Finally, in 2016, Tran, who had never before showed an interest in harvest operations, used a drone to video Underwood's harvest.  After he cut ties with Underwood, he used the video to show other farmers how to harvest efficiently.

There is more than ample evidence to support a finding of fraud based on affirmative misrepresentation.

II

*Alleged Inconsistent Jury Findings*

Huy Fong contends the jury made inconsistent findings on the parties' contract.

On the jury's special verdict form, the jury answered yes to both the following questions:  "Did Underwood Ranches LP and Huy Fong Foods, Inc. enter into an ongoing contract (something more than annual contracts) whereby Underwood Ranches would grow jalapeño peppers for Huy Fong?"  "Did Underwood Ranches

13.

LP and Huy Fong Foods, Inc. enter into a contract for the 2017 jalapeño pepper growing season?"

A special verdict is inconsistent if there is no possibility of reconciling its findings with each other.  (*Singh v. Southland Stone U.S.A., Inc.* (2010) 186 Cal.App.4th 338, 357.)

Here the jury's findings are consistent and easily reconciled.  Read together, the jury found that the parties had an ongoing contractual relationship that included the 2017 jalapeño growing season.

III

*Motion for New Trial*

Huy Fong contends the trial court abdicated its responsibility to sit as a 13th juror in ruling on its motion for a new trial.

Huy Fong made a motion for a new trial on the ground of insufficiency of the evidence to justify the verdict.  (Code Civ. Proc., § 657, subd. 6.)

Code of Civil Procedure section 657 provides, in part:  "A new trial shall not be granted upon the ground of insufficiency of the evidence to justify the verdict or other decision . . . unless after weighing the evidence the court is convinced from the entire record, including reasonable inferences therefrom, that the court or jury *clearly* should have reached a different verdict or decision."  (Italics added.)

Huy Fong's contention that the trial court abdicated its duty is based on the court's statement:  "I may be the 13th juror, but I don't view myself as the super juror where, because I disagree with what the jury has returned in the way of a verdict, I can just, you know, run over the top of it and substitute my personal opinion for theirs."

14.

Huy Fong apparently believes the trial court does have the power to substitute the court's personal opinion for that of the jury. Huy Fong relies on *Ryan v. Crown Castle NG Networks, Inc.* (2016) 6 Cal.App.5th 775. In *Ryan*, the Court of Appeal reversed the trial court's denial of the plaintiff's motion for a new trial on the ground of inadequate damages because the trial court implied it had no power to question the adequacy of the jury's award and because the trial court did not evaluate the evidence. (*Id.* at pp. 783-786.)

But here the trial court evaluated the evidence and did not say it had no power to question the jury's verdict. The court said it had no power to act as a super juror and substitute its personal opinion for that of the jurors. That is a correct statement of the law and reflects how all judges are duty bound to act. To do otherwise would impoverish our system of justice.

Underwood has a constitutional right to a jury trial. (Cal. Const., art I, § 16.) Code of Civil Procedure section 657 empowers the trial court to grant a new trial only when after independently evaluating the evidence the court concludes the jury's verdict is "clearly" wrong. The court cannot grant a new trial simply because it would have found differently than the jury. (*Dominguez v. Pantalone* (1989) 212 Cal.App.3d 201, 216.) That is what the trial court said.

The purpose of Code of Civil Procedure section 657 is not to give the trial court permission to run roughshod over a party's constitutional right to jury determination. Instead, the purpose is to allow the trial court to grant a new trial on those rare occasions when the jury's verdict is so at odds with any reasonable view of the evidence that judicial intervention is

15.

required to avoid a manifest miscarriage of justice. To the extent *Ryan* can be read to the contrary, we decline to follow it.

IV

*Punitive Damages*

Huy Foods contends that the $10 million punitive damage award must be vacated.

Huy Fong argues that punitive damages cannot be awarded for breach of contract in the absence of an independent tort. But here punitive damages were awarded for fraud, not breach of contract. Punitive damages may be awarded for fraud even though the fraud incidentally involves breach of contract. (See *Schroeder v. Auto Driveaway Co.* (1974) 11 Cal.3d 908, 921 [defendants who contracted to transport plaintiffs' goods are liable for punitive damages for fraudulently concealing they were not authorized by the Interstate Commerce Commission to transport goods].)

Huy Fong's reliance on *Applied Equipment Corp. v. Litton Saudi Arabia, Ltd.* (1994) 7 Cal.4th 503, 516, is misplaced. In that case our Supreme Court held that a party cannot be liable for conspiracy to interfere with its own contract. This case involves fraud, not interference with contract. If a party could interfere with its own contract, every breach of contract would be a tort. But not every breach of contract involves fraud.

Huy Fong argues that punitive damages were not proven by clear and convincing evidence. (Civ. Code, § 3294, subd. (a) [to recover punitive damages, fraud must be proven by clear and convincing evidence].) But the jury unanimously found fraud by clear and convincing evidence. We stated the evidence that supports a finding of fraud by affirmative misrepresentation and fraudulent concealment. We viewed the record as a whole and

16.

determine that the record contains substantial evidence from which a reasonable trier of fact could have made the finding of the high probability demanded by the clear and convincing evidence standard.  (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1005.)

Finally, Huy Fong argues the $10 million punitive damages award was so excessive as to violate federal due process.  The United States Supreme Court has set forth three guideposts for reviewing a punitive damages award:  "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." (*State Farm Mutual Automobile Insurance Co. v. Campbell* (2003) 538 U.S. 408, 418.)

Concerning the first guidepost, the Supreme Court stated: " '[T]he most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct.'  [Citation.]  We have instructed courts to determine the reprehensibility of a defendant by considering whether: the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident." (*State Farm Mutual Automobile Insurance Co. v. Campbell*, *supra*, 538 U.S. at p. 419.)

Concerning the first guidepost, the degree of reprehensibility, it is true that Huy Fong's fraudulent conduct

17.

did not directly physically harm anyone.  But in addition to the mental distress Craig felt, 40 people lost their jobs.  The harm done by Huy Fong's deception was not limited to Craig.  The emotional distress and loss of jobs were entirely foreseeable.  Huy Fong simply did not care.  In addition, Underwood was particularly vulnerable.  Almost all of Underwood's production was devoted to Huy Fong.  Huy Fong encouraged Underwood's dependence by demanding that Underwood obtain more acreage and by promising to buy all that Underwood produced.  Even if Huy Fong's deception may be described as a single incident, Huy Fong had been planning the deception for some period of time.  It did not occur in an aberrant moment.  Finally, the harm was the result of intentional deceit, not a mere accident.  The degree of reprehensibility is more than sufficient to support the punitive damages award.

The second guidepost, the disparity between the actual harm and the punitive damages award, also favors affirming the award.  The United States Supreme Court has refused to draw a bright line.  (*Simon v. San Paolo U.S. Holding Co., Inc.* (2005) 35 Cal.4th 1159, 1181.)  But few awards exceeding a single-digit ratio between punitive and compensatory damages will satisfy due process.  (*State Farm Mutual Automobile Insurance Co. v. Campbell*, *supra*, 538 U.S. at p. 425.)  Past decisions approving ratios of three- or four-to-one are "instructive."  (*Ibid.*)

Here the ratio of punitive to compensatory damages is 0.75-to-one.  Even if we were to consider the reprehensibility factor to be in the middle range, the low punitive to compensatory damages ratio supports the award.

Finally, the third guidepost is the difference between the punitive damages award and the civil penalties authorized or

imposed in comparable cases. Our Supreme Court has noted that the third guidepost is less useful in a case like this where plaintiff prevailed only on a cause of action involving common law tort duties that do not lend themselves to comparison with statutory penalties. (*Simon v. San Paolo U.S. Holding Co., Inc. supra*, 35 Cal.4th at pp. 1184-1185.) Nevertheless, "we do note that California [statutes] typically impose[] treble damages penalties for fraudulent and bad faith conduct." (*Bardis v. Oates* (2004) 119 Cal.App.4th 1, 24.) There is nothing about statutory penalties that indicates a 0.75-to-one ratio of punitive to compensatory damages is excessive. Far from it. Here the award of punitive damages is low.

<em>Underwood's Appeal</em>

Underwood appeals the judgment of nonsuit on its claims against Tran: intentional interference with prospective economic advantage and interference with contract.

Underwood asserts the appeal is protective. If we affirm the judgment against Huy Fong, it will be unnecessary for us to consider Underwood's claims against Tran.

Because we affirm the judgment against Huy Fong, it is unnecessary for us to consider Underwood's appeal.

DISPOSITION

The judgment is affirmed. Costs are awarded to Underwood.

<u>CERTIFIED FOR PUBLICATION.</u>

GILBERT, P. J.

We concur:

YEGAN, J.                    TANGEMAN, J.

19.

Henry J. Walsh, Judge

Superior Court County of Ventura

_____

Latham & Watkins, Joshua G. Hamilton, Dixie C. Tauber, Roman Martinez, Charles S. Dameron, Riley T. Keenan; Pearson, Simon & Warshaw, Thomas J. Nolan for Plaintiff, Cross-defendant and Appellant Huy Fong Foods, Inc., and Cross-defendant and Respondent David Tran.

Ferguson Case Orr Paterson, Wendy C. Lascher, John A. Hribar, James Q. McDermott, Michael A. Velthoen and Jessica M. Wan for Defendant, Cross-Complainant and Appellant Underwood Ranches and Cross-complainant and Respondent Underwood & Son.