Filed 9/7/21

**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE


| | |
|---|---|
| NIGEL HUDSON, | B300017 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. SP008763) |
| v. | |
| LUCAS FOSTER, | |
| Defendant and Respondent. | |


APPEAL from an order of the Superior Court of Los Angeles County, Brenda Penny, Judge.  Reversed and remanded, with directions.

Law Offices of Martin L. Horwitz and Martin L. Horwitz; Klapach & Klapach and Joseph S. Klapach for Petitioner and Appellant.

Garrett & Tully, Ryan C. Squire, Adjoa M. Anim-Appriah for Respondent.

_____

A conservatee filed a motion asking the probate court to exercise its inherent equitable authority to set aside an order approving his former conservator's final account due to misrepresentations of material fact in the account. The probate court denied the motion after finding that the conservatee failed to show he was unaware of the defects in the account at the time it was approved, or failed to act with reasonable diligence to set aside the order in light of information that he should have known. On appeal, the conservatee contends the order denying the motion to vacate is appealable, because it is based on the probate court's equitable power to set aside an order obtained through extrinsic fraud. The conservatee further contends that the order approving the account was not preclusive under Probate Code section 2103,[1] because it was based on misrepresentations of material fact, and as a result, the trial court abused its discretion by refusing to set aside the order.

We agree that the order denying the motion to vacate for extrinsic fraud is appealable in this case. Misrepresentations of material fact in a conservator's account are treated as extrinsic fraud. We hold that a conservatee has no duty to investigate representations of fact in the conservator's account, unless the conservatee becomes aware of facts from which a reasonably prudent person would suspect wrongdoing. Therefore, to set aside an order approving the conservator's account on the ground of extrinsic fraud, a conservatee is not required to establish that the misrepresentations of material fact in the account could not have been discovered prior to entry of the order approving the

_____

[1] All further statutory references are to the Probate Code unless otherwise specified.

2

account.  The probate court's ruling relied on legal authority that we find unpersuasive because it placed a higher burden to investigate on the conservatee.  The matter must be reversed and remanded for the probate court to exercise its discretion based on an accurate understanding of the applicable law.

## FACTUAL AND PROCEDURAL BACKGROUND

### Conservatorship of the Estate

In January 2007, petitioner and appellant Nigel Hudson was severely injured in a car accident.   An attorney was appointed guardian ad litem for Hudson.  A personal injury lawsuit filed on Hudson's behalf resulted in a settlement of $13,863,000.  In October 2011, the court in the personal injury case established a qualified settlement fund to receive the settlement proceeds.

The guardian ad litem filed a petition for a voluntary conservatorship of the estate on Hudson's behalf, resulting in the appointment of Hudson's friend, respondent Lucas Foster, as the general conservator of Hudson's estate on April 6, 2012.[2]  Foster is a film producer; he owns Warp Films, Warp Media Development, Inc., Warp LLC, and various single purpose entities.  Hudson retained testamentary capacity and the ability

---

[2] On February 13, 2012, Hudson filed a petition for dissolution of his marriage to Cynthia Kendall.  A final judgment was entered in the dissolution proceedings on April 3, 2013.  Kendall, who was unrepresented, waived spousal support and any interest in the proceeds of the civil action.  She received payment of $10,000 pursuant to the dissolution decree.

to make medical decisions, so he did not require a conservator of the person. Hudson and Foster agreed that Foster would advance the funds necessary to pay for goods and services for Hudson's benefit, and Foster would be reimbursed after the settlement proceeds were received. Hudson was able to view the records of the conservatorship bank account that were online.

In January 2013, the court in the personal injury case issued an order approving the disposition of the settlement proceeds. $5,090,974.25 was paid directly to the guardian ad litem for attorney fees, and $799,563.96 was paid directly to certain medical providers. In addition, the civil court order directed Foster to pay a total of $1,945,412.43 to creditors listed in attachments to the order. The attachments listed hundreds of creditors, including Miracle Mile and LA Litigation Copy Service. The attachments showed Miracle Mile's total bill was $11,250 and the negotiated balance was $10,125. The attachments listed the total amount owing to LA Litigation as $39,913.25.

## Order Approving Final Account

On December 28, 2013, Foster filed a first and final account in the probate case and a petition for approval of the account, allowance of attorney fees and costs, an order terminating conservatorship of the estate, and discharge of the conservator. Foster stated that he received property as conservator totaling $9,489,265.16, and disbursed $4,314,887.38. The disbursement schedule attached to the final account listed more than one thousand disbursements made to various entities during the accounting period from March 2, 2012, through October 31, 2013.

4

The property on hand at the close of the final account was $5,168,725.63, including cash of $2,730,932.03.

In the petition, Foster carefully explained that 17 checks were paid to him directly or to his film production company which were reimbursements for funds that he advanced to Hudson prior to receipt of the settlement funds. Each amount that Foster described in the petition as a reimbursement corresponded to an entry on the disbursement schedule. The disbursement schedule listed the payee for these transactions as Foster, Warp Film, Inc., or Warp Development, Inc., with a notation that the payment was a reimbursement for a specific expense. In addition to the 17 entries that Foster expressly brought to the court's attention in the petition, there were a few additional entries in the disbursement schedule listing amounts paid directly to Foster or one of his companies and stating the payments were in reimbursement for a specific expenditure made on Hudson's behalf. Foster waived payment of any conservator's commissions.

Foster also explained in the petition that the civil court order had directed him to pay specific creditors of the lawsuit. In some circumstances, a creditor accepted a reduced payment. Foster obtained receipts for all of the direct payments made to creditors. Debts totaling approximately $300,000 remained outstanding, however, because Foster was either unable to contact the creditor or the creditor had been unwilling to execute a receipt. Foster added, "[The remaining debts] will be fully set forth in a noticed supplement hereto. [¶] Conservator submits that these remaining debts simply be transferred to the Conservatee, who will be taking over the process privately."

Among hundreds of individual disbursements listed in the account was a payment on July 9, 2013, to "Miracle Mile Surgical

5

Center – per Court Order" in the amount of $10,000, paid with check number 2294. In addition, Foster made a payment on April 2, 2013, to "LA Litigation Copy Service – litigation expenses" in the amount of $31,089.25 with check number 2258. Foster made a payment on November 28, 2012, to "Dr. Sam Markzar, DDS – dental" in the amount of $9,839.10 with check number 2227.

Foster did not disclose in the petition that 28 checks shown as paid to third parties, including the checks to Miracle Mile, LA Litigation, and Markzar, were in fact paid to Foster or one of his companies. Miracle Mile and Markzar had not received any payment toward Hudson's debt. In other words, the checks listed as paid to Miracle Mile and Markzar were not paid to them, and the amounts received by Foster through these checks were not reimbursement for funds advanced to these creditors. LA Litigation received a payment from Foster toward Hudson's debt, but the amount was far less than was listed in the final account. The check numbers and payment amounts listed in the final account matched the information shown in the bank statements for the conservatorship, but the bank statements did not contain the names of the payees on the checks. Only the face of the checks revealed the payee information. The total amount of the 28 checks disbursed to Foster's own accounts, rather than to the payees listed in the final account, was $558,169.47.

Hudson and the guardian ad litem each signed a consent to the final account. On March 28, 2014, the probate court entered an order approving the final account.

**Events after Approval of the Final Account**

A week after the final account was approved, on April 4, 2014, a representative from Miracle Mile emailed an associate of Foster asking about the status of payment for the services that Miracle Mile provided to Hudson on two dates. Miracle Mile sent a second email on April 7, 2014, explaining that the company agreed in June 2011, to accept an offer of $10,125. The associate forwarded the messages to Foster with a note saying the amount needed to be paid and asking Foster to send a release to Miracle Mile. Foster forwarded the messages to Hudson with a note that said, "Let's discuss."

In a declaration filed later, Hudson described meeting with Foster at a coffee shop to discuss the messages from Miracle Mile. Calm and reassuring, Foster confirmed that Miracle Mile's bill was part of the outstanding $300,000 in medical expenses that Foster had been unable to negotiate and remained unpaid. Foster said he would have Miracle Mile sign a release and then the bill would be paid. Hudson never saw a release from Miracle Mile, and Foster never provided a supplement to the final account listing the bills that remained unpaid under the court order.

On October 18, 2014, more than 18 months after the payment date stated in the final account and six months after approval of the final account, LA Litigation signed a document which was provided to Foster, acknowledging receipt of $23,500 in release of all claims against Hudson.

Foster told Hudson that he could settle Hudson's outstanding bill with UCLA for $60,000, so Hudson provided $60,000 to pay the bill. Hudson later learned that Foster

negotiated a final payment of $54,500 in full satisfaction of UCLA's lien, but did not return the overpayment of $5,500 to Hudson.

On April 26, 2017, Hudson filed an unrelated civil action against Foster based on loans that Hudson made to Foster after the conservatorship ended. According to the complaint, the total amount borrowed was $400,000. Foster refused to sign a promissory note secured by a deed of trust. Hudson filed the civil action to compel Foster to repay the money borrowed after the conservatorship terminated, and to recover the difference between the amount that he gave Foster for payment of the UCLA bill and the amount received by UCLA.

In April 2018, Miracle Mile filed a motion in the personal injury case to enforce the settlement agreement. The motion was brought against Foster in his former role as conservator. Miracle Mile alleged that it had sent two letters to Foster without response. Miracle Mile had not received payment of its bill for $11,250 or any other sum required under the court ordered settlement.

## Motion to Vacate Order Approving Final Account

On August 30, 2018, Hudson filed a motion in the probate court to vacate the order approving the conservator's final account on the grounds of fraud and misrepresentation of material fact. Hudson stated that he was not aware of any fraud until Miracle Mile filed its motion seeking to enforce the settlement. After Miracle Mile insisted that it had not received any payment under the court order, Hudson ordered copies of his bank documents, including check images. Hudson saw that

8

check number 2294, which Foster's final account listed as paid to Miracle Mile, was in fact made payable to Warp Media Development, Inc. Hudson compared the check images that he received to the final account and discovered the 28 checks listed in the final account as paid to third parties that were actually made payable to Foster or one of his companies. In addition, Hudson discovered Foster had written four checks totaling more than $60,000 to himself or his company after the final account had been approved, which were not listed in the account. Hudson argued these discrepancies were misrepresentations of material fact that provided grounds to vacate the order approving the final account. Under section 2103, the conservator is not released from claims of the conservatee if the order is obtained by fraud or misrepresentation in the petition, account, or order as to any material fact.

In support of the motion, Hudson submitted his attorney's declaration describing discovery of the misrepresentations in the final account, the pleading filed by Miracle Mile in the civil action, the disbursement schedule from Foster's final account, and copies of bank statements and check images showing that the payees in the check images were not the parties listed in the final account.

**Opposition to Motion to Vacate**

On October 11, 2018, Foster filed an opposition to the motion to vacate the order approving the final account. He explained that the parties had agreed Foster would advance funds for Hudson's benefit and be reimbursed for these sums upon payment of the settlement proceeds from the personal

9

injury case. At all times, Hudson had online access to the conservatorship bank account and was aware of all financial transactions undertaken by Foster.

Foster's counsel arranged for Nan Buchanan to prepare the conservator's account. All of the documents relating to the conservatorship income and expenses, receipts and disbursements, were provided to Buchanan. Buchanan prepared the schedules for the final conservatorship account. The schedules reflected direct payments to medical providers, as well as payments for goods or services that were advanced by Foster and reimbursed to him. The report disclosed and explained the advances made for Hudson's benefit. Hudson discussed the final account with his guardian ad litem, and each consented to the account in writing. The account was also reviewed by the probate court investigator.

When the conservatorship terminated in 2014, Hudson was aware of the dispute over payment of Miracle Mile's bill. After preparation of the final account, copies of every document related to the account, including cancelled checks, invoices, bills, statements, and other memorandum, were delivered in multiple storage boxes to Hudson, who had ample time to review the documents and object to the account or set aside the order approving the account within the statutory time period.

Foster argued that no fraud had been shown. He admitted it was arguable that the account represented direct payment was made to a medical provider when the check was, in fact, a reimbursement to Foster. He explained, "The fact that the schedule of disbursements prepared by Nan Buchanan reflected the underlying payees who provided services rather than reflecting that Warp paid the provider and was reimbursed is

10

perhaps unclear, but is certainly not a fraud." Hudson had not alleged, and could not show, that the expenditures reflected in the account were not advanced for his benefit. Although the representations "might have been better presented in a separate schedule reflecting both the underlying provider and the reimbursement to Foster, they are not fraudulent, nor are they untrue. There is no evidence suggesting the account is substantively inaccurate." He noted that no medical provider disputed payment other than Miracle Mile, and there was no damage to Hudson because all his bills had been paid.

In addition, Foster argued the motion was untimely. Foster relied on the legal authority of *Knox v. Dean* (2012) 205 Cal.App.4th 417 (*Knox*), to argue that a party seeking to set aside a judgment based on misrepresentations of fact must show the facts could not reasonably have been discovered prior to the entry of judgment. He also noted that Hudson had not submitted his own declaration in support of the motion. Hudson was aware of every transaction reflected in the account and Hudson had not shown that he could not reasonably have discovered the allegedly false information prior to entry of judgment.

Foster submitted his own declaration in support of the opposition. He had advanced hundreds of thousands of dollars to purchase goods and services for Hudson's benefit, which were reimbursed with payments from the conservatorship bank account. He discussed each of the payments and reimbursements with Hudson as they occurred. Hudson had no objections and was grateful that Foster could facilitate the purchases. Hudson was at all times aware of, and agreed to the advances and the reimbursements. Foster did not request or receive any compensation for the time and effort he expended as Hudson's

11

conservator. All of the funds that were reimbursed directly to Foster or any entity for which he is the principal were reimbursements for money advanced for Hudson's use and benefit. Buchanan was provided all the banking records, invoices, and other documents related to the conservatorship account, and Buchanan prepared the various accounting schedules attached to the final account.

When Foster received Miracle Mile's email seeking payment after the court approved the final account and terminated the conservatorship, he forwarded the messages to Hudson with an offer to discuss the bill. He was not sure why Miracle Mile had not been paid long ago, or why Miracle Mile waited so long to take legal action, but Hudson had been aware of the issue for more than four years, and it was not new information.

**Reply and Initial Hearing**

Hudson filed a reply on October 17, 2018. He noted that Foster's opposition admitted the payees on the checks were not the payees identified in the account. Hudson, the guardian ad litem, and the court staff had relied on the conservator's statements in the account. There was nothing in the account to put Hudson on notice of any irregularities. They had the right to rely on the statements of the court-appointed conservator.

In support of the reply, Hudson filed his own declaration. He declared that he had no idea, and no reason to believe, the checks listed in the disbursement schedule were not made payable to the parties represented in the account and instead were paid to Foster or his companies. Hudson was not aware of

12

all of the financial transactions undertaken by Foster. He was shocked and disappointed that the person in whom he had placed his trust and confidence took money from his account in this manner. Hudson disputed Foster's statement that all the expenditures made by Foster or his companies were made for Hudson's benefit. Foster did not give him copies of every document related to the account. When Hudson asked for copies of his records, Foster said all of Hudson's records were swept away and destroyed in mud slides that affected Foster's house in Montecito, California. Before Miracle Mile filed its motion to enforce payment, Hudson had no reason to believe Foster had not paid Miracle Mile the amount approved by the court and no reason to compare the payees on the checks to verify that they matched the payees identified by Foster in his account.

A hearing was held on the motion to vacate the account on October 25, 2018. Foster argued that even if he had taken money as alleged in the motion, his email forwarding Miracle Mile's request for payment in 2014 put Hudson on notice and the statute of limitations began to run. In response, Hudson argued his own access to financial information did not absolve Foster from providing correct information or require Hudson to verify that the payees listed in the account were paid. The court concluded that it did not have sufficient evidence to support a fraud claim and gave Hudson an opportunity to file additional points and authorities.

## Supplemental Pleadings

On February 14, 2019, Hudson filed additional points and authorities. He argued that under section 2103, the order

13

settling the final account of the conservator did not provide protection from claims when the order was obtained by fraud or misrepresentation in the petition or the account as to any material fact. The conservator had a duty to accurately disclose all disbursements, but had instead misrepresented the payee information. The amounts in question were not reimbursements; Foster had clearly identified reimbursements elsewhere in the account.

Hudson argued that the statute of limitations did not begin to run until Hudson discovered facts putting him on notice of the fraud, specifically, when Miracle Mile filed the motion to enforce the settlement on April 19, 2018. Hudson's receipt of the message forwarded from Miracle Mile did not put Hudson on notice that the accounting was fraudulent, because Foster also notified the court that medical liens totaling $300,000 remained unsatisfied and would be Hudson's responsibility to negotiate after the conservator was released.

Hudson and the court staff who investigated the accounting did not have access to physical copies of the checks. By accurately listing check numbers and payment amounts, but changing the identity of the payee, Foster demonstrated an intent to conceal information and deceive Hudson and the court. Hudson was harmed because the funds were not used to pay the named payee for the services stated and the money is no longer in Hudson's account or available for his benefit. The misrepresentations were sufficient to support vacating the order approving the account.

Hudson submitted his declaration stating that Foster never informed Hudson which unpaid liens were assigned to him to negotiate after the conservatorship was terminated. Hudson

14

learned Miracle Mile's bill was not paid as stated in the final account when Miracle Mile filed its motion to enforce payment and Hudson investigated the payment history. After Miracle Mile denied receiving payment and the check image confirmed that payment was not made as stated in the account, Hudson paid Miracle Mile.

Foster filed additional points and authorities, but did not cite any additional legal authority. He argued Hudson knew or should have known of the facts claimed to constitute fraud when Foster forwarded the email about Miracle Mile's unpaid bill. Hudson had ample opportunity to examine the account but had offered no explanation for failing to discover the facts earlier.

On March 19, 2019, Hudson filed a supplemental reply. He argued that the parties who reviewed the final account were not required to confirm that checks had been accurately listed. As a fiduciary, the conservator was required to be truthful and not misrepresent material facts. Hudson identified representations of fact in the account about payments to Markzar, LA Litigation, and an entity named Sunset Studios Media Solutions, which Hudson claimed were false. He submitted the final account and copies of the check images. In the final account, Foster represented that he paid $9,839.10 to Markzar with check number 2227. The check image showed check number 2227 was paid to Warp Film, Inc. Hudson also submitted a declaration from Markzar as a custodian of records stating the total cost of Hudson's dental care was $8,790, and no check or payment of any type was received on Hudson's account from Foster or any of his business entities. Hudson personally paid for all dental care.

In the final account, Foster represented LA Litigation was paid $31,089.25 with check number 2258. In fact, the check image showed check number 2258 was made payable to Warp Media Development, Inc. Hudson submitted a declaration from Marcelo Marciano as a custodian of records for LA Litigation. Marciano confirmed check number 2258 in the amount of $31,089.25 was not received on Hudson's account at LA Litigation. Hudson submitted a similar declaration from a custodian of records for Sunset Studios Media Solutions.

The probate court held another hearing on March 27, 2019. The court concluded that Hudson had not yet provided sufficient information concerning his personal knowledge of the account to determine whether he acted with diligence in seeking to vacate the order. The court continued the motion and directed Hudson to file a personal declaration within ten days of the continued hearing date discussing in detail the circumstances surrounding the discovery of the disputed issues with the account. Hudson was to address his relevant prior communications with Foster, and his understanding of any advances Foster made for Hudson's benefit during the administration of the conservatorship. Foster was permitted to file a reply.

Hudson filed a supplemental declaration. When he received the email from Foster to discuss payment to Miracle Mile, Hudson believed there were outstanding bills that had not been settled, as stated in the final account. The information that he still owed money to Miracle Mile did not put Hudson on notice that the payments listed in the final account were false. Hudson described the meeting with Foster at Starbucks. Foster did not say Miracle Mile's bill had been paid already. Instead, Foster confirmed Miracle Mile's request was part of the unpaid medical

expenses which he had not been able to negotiate.  Foster said before Miracle Mile was paid, he was going to get a release agreement signed, and thereafter, Miracle Mile would be paid. Hudson never had any reason to distrust Foster, who was his friend and advisor, and he had no reason to independently confirm what Foster said.  The matter did not come up again until Miracle Mile filed its motion against Foster.  Foster did not give Hudson any reason in any of their discussions to think that the checks listed in the final account were false or contained misrepresentations.  Hudson would not have been able to discover the fraud without seeing the copies of cancelled checks.

Hudson asked Foster to purchase items and services for him, and he was aware that Foster intended to reimburse himself for the amounts that he spent on behalf of Hudson.  The checks represented in the final account as paid to creditors, but which were actually paid to Foster, were not reimbursements, as shown by the declarations from Markzar, LA Litigation, and Sunset Studios Media Solutions.  Hudson was also not aware of several checks Foster wrote after the final account was filed with the court and which were not approved by the court.  Hudson described the allegations of his civil action against Foster as we

Hudson also filed a declaration by his attorney Martin Horwitz.  Horwitz explained that the motion filed by Miracle Mile against Foster in the personal injury case sought payment of $20,099.89, which included the total principal of the bill, plus fees and interest.  Hudson asked Horwitz whether he needed to take any action in response to the motion.  The final account had listed a payment of $10,000 to Miracle Mile, but Horwitz could not tell from any of the documents whether this was a partial payment or payment in full.  Horwitz served a subpoena for

17

production of the bank records, which included the check images. Had Miracle Mile not filed a motion to enforce its lien, the false information in the final account would not have been discovered. Horwitz also learned that Foster continued to sign checks on the conservatorship account to himself and his companies in February and March 2014, after the final account had been filed with the court and approved by the guardian ad litem and Hudson. Horwitz also described the civil lawsuit based on acts that took place after the conservatorship terminated.

In May 2019, Foster filed a reply to the supplemental declarations of Hudson and Horwitz, but did not cite any additional legal authority. Foster argued the discrepancies between the final account and the checks were not evidence of fraud. Hudson had intimate involvement in all aspects of his financial affairs. The parties had an understanding that Foster would be reimbursed when Hudson received his personal injury settlement, which is what occurred. The account was not challenged during the statutory period to appeal, even though Hudson had sufficient knowledge to do so. Hudson knew Miracle Mile's bill was unpaid, because Miracle Mile's bill was the subject of the email forwarded to Hudson in 2014, and Foster had offered to discuss the matter.

Foster argued Marciano's declaration was carefully drafted to suggest that LA Litigation had not been paid at all. In fact, LA Litigation was paid $23,500, and Marciano signed a release dated October 18, 2014, admitting the full amount of any claim due to LA Litigation was paid. Check number 2258, which was listed in the final account as paid to LA Litigation on April 2, 2013, was paid to Warp Media Development for multiple reimbursements to medical providers or purchases on behalf of Hudson that had

18

been lumped together, including the amount paid to LA Litigation.

Foster emphasized that the issue before the probate court was whether extrinsic fraud existed to justify setting aside a final order. Hudson had sufficient information from which he knew, or should have known, about any potential error or discrepancy in the account. If Hudson had any reason to suspect an error, misstatement or deception, he should have acted to challenge the accounting years earlier and should not be rewarded for slumbering on his rights.

In support of the reply, Foster submitted the release that Marciano signed on behalf of LA Litigation on October 18, 2014. Foster submitted his own declaration as well. He attached communications about conservatorship finances between Hudson and Foster. Foster described funds advanced for specific expenses, which were often coordinated through an employee of Warp Films. Hudson had the ability to view cancelled checks, disbursements, and bank statements at any time. Foster did not believe he made any representation that was false, and he did not believe Hudson relied on a representation by Foster to his detriment. Hudson suffered no damage; no medical providers came forward other than Miracle Mile. There has been no showing of any fraud sufficient to set aside the court order obtained within the framework of normal court procedures years ago and which should be determinative.

**Final Hearing on Motion to Vacate**

The probate court held a final hearing on the motion to vacate the account on June 5, 2019. Hudson acknowledged that

he received items paid for by Foster and he had understood that Foster would be reimbursed for those items, but he argued that reimbursements were a separate issue. Hudson was not challenging the checks listed in the account as paid to Foster in reimbursement for funds that he had advanced. In addition to the reimbursements that Foster disclosed, Foster had written checks to himself that he told the court were written to third parties. Hudson later found out that Foster did not make the payments to third parties that the account said had been made. These checks were not reimbursements. Hudson was not required to conduct a private accounting of the checks that his fiduciary testified to making in the final account. Moreover, Foster wrote additional checks to himself after the final account was approved.

When Miracle Mile filed the motion against Foster alleging more than $20,000 dollars was owed on Hudson's account, Hudson asked his attorney if he needed to take any action. Horwitz saw the payment of $10,000 to Miracle Mile listed in the disbursement schedule, but did not know if that was a full or partial payment. Only after viewing the checks could they determine the check listed in the final account was not made payable to the creditor. Even learning that the check was paid to Foster's company did not provide notice of fraud until Miracle Mile explained that no payment had been received at all. Hudson was seeking to vacate the order approving the account in order to file objections to the final account and determine whether the fiduciary had acted properly.

Foster's attorney argued that Hudson had notice and an opportunity to investigate whether Miracle Mile's bill was paid in 2014. It was unfair to litigate at this point when everyone's

recollection had faded, Foster no longer had documents, and the attorney who had represented Foster was no longer practicing. Although Hudson told Foster during their meeting at Starbucks to get a release from Miracle Mile, Foster had never provided Hudson with a release or a canceled check showing payment to Miracle Mile. Hudson did nothing and sat on his rights for too long. Foster was disadvantaged because he had access to counsel before the conservatorship was terminated, but could no longer hire an attorney to represent him in his role as conservator and would have to pay out of his own funds to defend himself. The probate court took the matter under submission.

**Probate Court Ruling**

On June 18, 2019, the probate court issued a minute order denying the motion to vacate the order approving the final account. The order stated, "The Court finds that Nigel Hudson has not provided sufficient information regarding his personal knowledge of the circumstances of the accounting. Former Conservator, Lucas Foster, with support, contends Nigel [Hudson] knew about a certain reimbursement procedure he was undertaking. Nigel Hudson, though specifically given [an] opportunity to describe what he did or did not know about any reimbursements, only addresses the subject in general terms. Movant Nigel Hudson has not shown he was unaware of the defects in the accounting at the time, or, at the very least, has not shown he acted with reasonable diligence in seeking to vacate the

order based on the information that he should have known." Hudson filed a timely notice of appeal from the order.[3]

## DISCUSSION

## Appealability

Hudson contends that the order denying the motion to vacate the approval of the final account is appealable, because it was based on the court's inherent equitable power to set aside an order obtained through extrinsic fraud.  We agree.

The only appealable orders in probate proceedings are those listed in the Probate Code.  (§§1300–1304; Code Civ. Proc., § 904.1, subd. (a)(10); *Kalenian v. Insen* (2014) 225 Cal.App.4th 569, 575–576 (*Kalenian*); *Estate of Stoddart* (2004) 115 Cal.App.4th 1118, 1125–1126.)  An order settling an account of a fiduciary is an appealable order.  (§1300, subd. (b).)  An order denying a motion to vacate an order on equitable grounds is generally not appealable.  (*Kalenian, supra*, 225 Cal.App.4th at p. 577; *Estate of Baker* (1915) 170 Cal. 578, 581–582 (*Baker*).)  Otherwise, an unsuccessful party would have two appeals from the same judgment:  one appeal provided by law within a limited time period and another at an indefinite time in the future at the convenience of the litigant after the denial of a motion to vacate the judgment.  (*Baker, supra*, 170 Cal. at p. 582.)

---

[3] Hudson's corrected motion to take additional evidence on appeal, which was filed with this court on March 22, 2021, is denied.  The evidence was not before the trial court and is not necessary to resolve the issues on appeal.

Under limited circumstances, however, a probate court order denying a motion to vacate on equitable grounds is appealable. (*Kalenian*, *supra*, 225 Cal.App.4th at p. 577.) If the judgment or decree was final and appealable, then an order refusing to vacate the judgment or decree is appealable "when, for reasons involving no fault of the appealing party, he has never been given an opportunity to appeal directly from the judgment or decree." (*Baker, supra,* 170 Cal. at p. 582.)

In this case, the order approving the final account was an appealable order, so there is no concern of indirectly allowing an appeal from a nonappealable order. The motion seeking to vacate the order was based on equitable fraud in the form of misrepresentations of fact by a fiduciary which deprived the conservatee of a full and fair opportunity to object to the final account prior to entry of the order approving the account. Under the circumstances of this case, the order denying the motion to set aside the order approving the final account is an appealable order.

**Standard of Review**

We review an order denying equitable relief for an abuse of discretion. (*County of San Diego v. Gorham* (2010) 186 Cal.App.4th 1215, 1230.) "In doing so, we determine whether the trial court's factual findings are supported by substantial evidence [citation] and independently review its statutory interpretations and legal conclusions [citations]." (*Ibid*.)

"'In assessing whether any substantial evidence exists, we view the record in the light most favorable to respondents, giving them the benefit of every reasonable inference and resolving all

23

conflicts in their favor.' [Citation.]" (*Kramer v. Traditional Escrow, Inc.* (2020) 56 Cal.App.5th 13, 28.) "'A finding . . . based upon a reasonable inference . . . will not be set aside by an appellate court unless it appears that the inference was wholly irreconcilable with the evidence. [Citations.]' [Citation.] '[W]hen the evidence gives rise to conflicting reasonable inferences, one of which supports the finding of the trial court, the trial court's finding is conclusive on appeal. [Citation.]' [Citation.]" (*Phillips v. Campbell* (2016) 2 Cal.App.5th 844, 851.)

"Normally, we must presume the trial court was aware of and understood the scope of its authority and discretion under the applicable law. [Citations.]" (*Barriga v. 99 Cents Only Stores LLC* (2020) 51 Cal.App.5th 299, 333–334 (*Barriga*).) "If the record demonstrates the trial court was unaware of its discretion or that it misunderstood the scope of its discretion under the applicable law, the presumption has been rebutted, and the order must be reversed. [Citation.] "'[A]ll exercises of legal discretion must be grounded in reasoned judgment and guided by legal principles and policies appropriate to the particular matter at issue." [Citations.] Therefore, a discretionary decision may be reversed if improper criteria were applied or incorrect legal assumptions were made. [Citation.] Alternatively stated, if a trial court's decision is influenced by an erroneous understanding of applicable law or reflects an unawareness of the full scope of its discretion, it cannot be said the court has properly exercised its discretion under the law. [Citations.] Therefore, a discretionary order based on the application of improper criteria or incorrect legal assumptions is *not* an exercise of *informed* discretion and is subject to reversal even though there may be substantial evidence to support that order. [Citations.] If the

24

record affirmatively shows the trial court misunderstood the proper scope of its discretion, remand to the trial court is required to permit that court to exercise *informed* discretion with awareness of the full scope of its discretion and applicable law.' (*F.T. v. L.J.* (2011) 194 Cal.App.4th 1, 15–16.)" (*Barriga, supra,* 51 Cal.App.5th at p. 334.)

## Fiduciary Duty to Account Generally

It is undisputed that as conservator, Foster had a fiduciary duty to Hudson that required Foster to account for transactions. "There is a fiduciary relationship between the conservator and conservatee. (§ 2101.)" (*Conservatorship of Presha* (2018) 26 Cal.App.5th 487, 498; *Conservatorship of Lefkowitz* (1996) 50 Cal.App.4th 1310, 1313.) The conservator must account to the court for the property of the conservatee with information about receipts, disbursements, transactions, and the remaining assets. (*Johnson v. Kotyck* (1999) 76 Cal.App.4th 83, 89.) The conservator must also prevent misappropriation of the conservatee's assets. (*Ibid*.) A fiduciary has a duty to provide full disclosure of all material facts that affect the beneficiary's interest. (*Ball v. Posey* (1986) 176 Cal.App.3d 1209, 1214.) "Even the lack of full disclosure will amount to fraud, because the fiduciary's obligation is affirmative." (*Ibid*.)

Even without the conservatorship, the parties may have a confidential relationship. "It is well settled that '[a] confidential relationship exists when one party gains the confidence of the other and purports to act or advise with the other's interests in mind; it may exist although there is no fiduciary relationship; it is particularly likely to exist when there is a family relationship

or one of friendship.'  [Citations.]"  (*Estate of Sanders* (1985) 40 Cal.3d 607, 615 (*Sanders*).)

"Fiduciary" and "confidential" have been used interchangeably to describe a relationship in which one party has a duty to act in the highest good faith for the benefit of the other party.  (*Richelle L. v. Roman Catholic Archbishop* (2003) 106 Cal.App.4th 257, 270.)  When a person places confidence in another person, the person who voluntarily accepted the confidence cannot take any advantage from acts undertaken for the other party without the knowledge or consent of that party.  (*Ibid*.)  "Technically, a fiduciary relationship is a recognized legal relationship such as guardian and ward, trustee and beneficiary, principal and agent, or attorney and client [citation], whereas a 'confidential relationship' may be founded on a moral, social, domestic, or merely personal relationship as well as on a legal relationship.  [Citations.]  The essence of a fiduciary or confidential relationship is that the parties do not deal on equal terms, because the person in whom trust and confidence is reposed and who accepts that trust and confidence is in a superior position to exert unique influence over the dependent party."  (*Barbara A. v. John G.* (1983) 145 Cal.App.3d 369, 382–383.)

## Equitable Power of the Probate Court to Vacate Order

The doctrine of res judicata applies in probate proceedings to bar a party from relitigating a claim that has been finally determined in a prior proceeding.[4]  (*Lazzarone v. Bank of*

---

[4] Courts have often used "res judicata" to refer to both claim preclusion and issue preclusion.  (*DKN Holdings LLC v.*

*America* (1986) 181 Cal.App.3d 581, 591 (*Lazzarone*).)  However, the probate court has inherent equitable authority to set aside an order or decree when extrinsic factors have deprived a party of a fair adversary hearing.  (*Sanders, supra,* 40 Cal.3d 607, 614; *Estate of Charters* (1956) 46 Cal.2d 227, 234–235; *Jorgensen v. Jorgensen* (1948) 32 Cal.2d 13, 18 (*Jorgensen*).)  Courts require a showing of extrinsic fraud or mistake in order to balance the public policy in favor of the finality of judgments with the policy in favor of providing litigants a fair opportunity to present a case.  (*Sanders*, *supra*, 40 Cal.3d at p. 614.)

The requirements for equitable relief have been articulated by some courts as a three-part test.  (*In re Marriage of Stevenot* (1984) 154 Cal.App.3d 1051, 1069 (*Stevenot*) [extrinsic fraud]; *Rappleyea v. Campbell* (1994) 8 Cal.4th 975, 982 [extrinsic mistake].)  In order to set aside a final order based on extrinsic fraud, "the moving party must demonstrate that he or she has a meritorious case, that [they have] a satisfactory excuse for not presenting a defense to the original action and that [they] exercised diligence in seeking to set aside the default once the

---

*Faerber* (2015) 61 Cal.4th 813, 823–824.)  "Claim preclusion, the ""primary aspect"" of res judicata, acts to bar claims that were, or should have been, advanced in a previous suit involving the same parties.  [Citation.]  Issue preclusion, the ""secondary aspect"" historically called collateral estoppel, describes the bar on relitigating issues that were argued and decided in the first suit.  [Citation.]"  (*Id*. at p. 824.)  "To avoid future confusion, we will follow the example of other courts and use the terms 'claim preclusion' to describe the primary aspect of the res judicata doctrine and 'issue preclusion' to encompass the notion of collateral estoppel.  [Citation.]"  (*Ibid*.)

fraud had been discovered." (*Stevenot, supra,* 154 Cal.App.3d at p. 1071.)

## A. Extrinsic Fraud

In this case, Hudson's claim that the conservator's account contained misrepresentations of material fact which amounted to extrinsic fraud is both the basis of his case as well as his excuse for failing to object within the original proceeding. The elements of fraud are misrepresentation, knowledge of falsity, intent to induce reliance on the misrepresentation, justifiable reliance on the misrepresentation, and resulting damages. (*Lazar v. Superior Court* (1996) 12 Cal.4th 631, 638.) The terms extrinsic fraud and extrinsic mistake have been interpreted broadly, encompassing "almost any set of extrinsic circumstances which deprive a party of a fair adversary hearing." (*In re Marriage of Park* (1980) 27 Cal.3d 337, 342.)

Fraud is extrinsic when a party is prevented from fully participating in the proceeding or deprived of the opportunity to present a claim to the court by the fraudulent conduct of another party, as opposed to the moving party's own negligence. (*Stevenot, supra,* 154 Cal.App.3d at p.1068; *City and County of San Francisco v. Cartagena* (1995) 35 Cal.App.4th 1061, 1067 (*Cartagena*).) "The clearest examples of extrinsic fraud are cases in which the aggrieved party is kept in ignorance of the proceeding or is in some other way induced not to appear. [Citation.]" (*Sanders, supra,* 40 Cal.3d at pp. 614–615.) Other examples include "concealment of the existence of a community property asset, failure to give notice of the action to the other party, and convincing the other party not to obtain counsel

because the matter will not proceed (and then it does proceed). ([*Stevenot, supra,* 154 Cal.App.3d at p. 1069].)" (*Cartagena, supra,* 35 Cal.App.4th at p. 1067.)

Fraud is generally considered intrinsic when a party had notice of the action and an opportunity to present a case, but unreasonably neglected to protect themselves from fraud or mistake involving the merits of the proceeding. (*Stevenot, supra,* 154 Cal.App.3d at pp. 1069–1070.) "The public policy underlying the principle of res judicata that there must be an end to litigation requires that the issues involved in a case be set at rest by a final judgment, even though a party has persuaded the court or the jury by false allegations supported by perjured testimony. This policy must be considered together with the policy that a party shall not be deprived of a fair adversary proceeding in which fully to present his case. Thus, equitable relief will be denied where it is sought to relitigate an issue involved in the former proceeding on the ground that allegations or proof of either party was fraudulent or based on mistake, but such relief may be granted if the party seeking it was precluded by fraud or the mistake of the other party from participating in the proceeding or from fully presenting his case. (*Gale v. Witt,* 31 Cal.2d 362, 365; *Howard v. Howard,* 27 Cal.2d 319, 321; *Westphal v. Westphal,* 20 Cal.2d 393, 397; *Larrabee v. Tracy,* 21 Cal.2d 645; *Olivera v. Grace,* 19 Cal.2d 570, 575; *Carr v. Bank of America,* 11 Cal.2d 366, 371–373; *Purinton v. Dyson,* 8 Cal.2d 322, 325–326; *Ringwalt v. Bank of America,* 3 Cal.2d 680, 684–685; *Caldwell v. Taylor,* 218 Cal. 471, 476–479; *Tracy v. Muir,* 151 Cal. 363, 371; see, Restatement, Judgments, p. 588; 3 Freeman, Judgments (5th ed.), §§ 1233–1235; 3 Pomeroy, Equity

29

Jurisprudence (5th ed.), p. 610.)" (*Jorgensen*, *supra*, 32 Cal.2d 13 at pp. 18–19.)

"The terms 'intrinsic' and 'extrinsic' fraud or mistake are generally accepted as appropriate to describe the two different categories of cases to which these policies of the law apply. [Citation.] They do not constitute, however, a simple and infallible formula to determine whether in a given case the facts surrounding the fraud or mistake warrant equitable relief from a judgment. [Citations.] It is necessary to examine the facts in the light of the policy that a party who failed to assemble all his evidence at the trial should not be privileged to relitigate a case, as well as the policy permitting a party to seek relief from a judgment entered in a proceeding in which he was deprived of a fair opportunity fully to present his case." (*Jorgensen*, *supra*, 32 Cal.2d 13 at p. 19.)

A critical wrinkle in the extrinsic fraud rule is applied to fiduciaries. A party may obtain relief from a judgment when the other party concealed facts in violation of a duty arising from a trust or confidential relationship, even though the facts concerned issues in the prior proceeding. (*Jorgensen, supra,* 32 Cal.2d 13 at p. 20.) "'The failure to perform the duty to speak or make disclosures which rests upon one because of a trust or confidential relation is obviously a fraud, for which equity may relieve from a judgment thereby obtained, even though the breach of duty occurs during a judicial proceeding and involves false testimony, and this is true whether such fraud be regarded as extrinsic or as an exception to extrinsic fraud rule.' [Citations.] In this state equitable relief has been granted from final judgments settling the accounts of guardians, administrators, or executors who withheld information that

would have enabled the beneficiaries to attack the accounts.  (*Lataillade v. Orena*, 91 Cal. 565, 576; *Silva v. Santos*, 138 Cal. 536, 541; *Aldrich v. Barton*, 138 Cal. 220, 223; *Simonton v. Los Angeles Trust & Sav. Bank*, 192 Cal. 651, 655, 657; *Morgan v. Asher*, 49 Cal.App. 172, 182; see *Griffith v. Godey*, 113 U.S. 89, 93.)" (*Jorgensen,* at pp. 20–21.)

"[W]here one is justified in relying, and does in fact rely, upon false representations, his right of action is not destroyed merely because opportunities for examination or means of knowledge were open to him where no legal duty devolved upon him to employ such means of knowledge.  [Citations.]" (*Stevens v. Marco* (1956) 147 Cal.App.2d 357, 378–379.)  For example, in *Conservatorship of Coffey* (1986) 186 Cal.App.3d 1431, 1443 (*Coffey*), the court concluded a life insurance beneficiary was not required to oversee the activities of the conservator, scrutinize accountings and detect omissions, warn the conservator or take other action, to receive a benefit that the conservator had a statutory duty to conserve.  (*Id.* at p.1443.)  "Sound policy considerations require that we reject the imposition of such a duty, for otherwise we would encourage the conservator who had acted with less than ordinary care and diligence to hide his failings by nondisclosure, hoping to eliminate or lessen his liability by the beneficiary's failure to detect the omission." (*Ibid.*)

"The courts are particularly likely to grant relief from a judgment where there has been a violation of a special or fiduciary relationship.  The commentators have observed that breach of a fiduciary duty may warrant setting aside the judgment even though the same conduct in a nonfiduciary relationship would not be considered extrinsic fraud.  (See

31

Freeman, Judgments, *supra,* § 1235, pp. 2575–2576; Moore, Moore's Federal Practice (2d ed. 1948) [¶] 60.37.[1], p. 614; Comment, *Seeking More Equitable Relief From Fraudulent Judgments: Abolishing the Extrinsic-Intrinsic Distinction* (1981) 12 Pacific L.J. 1013, citing above at p. 1021, fns. 65–66.)" (*Sanders*, *supra*, 40 Cal.3d at p. 615, fn. omitted.) ""Where there exists a relationship of trust and confidence it is the duty of one in whom the confidence is reposed to make full disclosure of all material facts within his knowledge relating to the transaction in question and any concealment of material facts is a fraud."' [Citations.] "'Where there is [such] a duty to disclose, the disclosure must be full and complete, and any material concealment or misrepresentation will amount to fraud sufficient to entitle the party injured thereby to an action.'" [Citations.]" (*Id*. at p. 616.)

Some legal authorities characterize a fiduciary's failure to disclose material facts as a second form of extrinsic fraud (*Lazzarone*, *supra*, 181 Cal.App.3d at pp. 596–597), while others describe it as an exception to the requirement of extrinsic fraud (*Jorgensen, supra,* 32 Cal.2d 13 at p. 19). It may also be explained by the balance of public policy considerations: when a judgment is obtained through a fiduciary's violation of the duty of disclosure to the moving party, the policy to provide a fair adversary proceeding outweighs the policy in favor of finality, and the moving party's reasonable reliance on the disclosures of a fiduciary is considered a satisfactory excuse for not presenting a defense in a prior proceeding.

## B. Section 2103

The preclusive effect of probate court orders governing guardians and conservators is established by statute. Section 2103 provides for finality, but incorporates the exception for extrinsic fraud as it is applied to fiduciaries: "(a) When a judgment or order made pursuant to this division becomes final, it releases the guardian or conservator and the sureties from all claims of the ward or conservatee and of any persons affected thereby based upon any act or omission directly authorized, approved, or confirmed in the judgment or order. For the purposes of this section, 'order' includes an order settling an account of the guardian or conservator, whether an intermediate or final account. [¶] (b) This section does not apply where the judgment or order is obtained by fraud or conspiracy or by misrepresentation contained in the petition or account or in the judgment or order as to any material fact. For the purposes of this subdivision, misrepresentation includes, but is not limited to, the omission of a material fact." (Prob. Code, § 2103.)

## C. Duty of Diligence to Discover Misrepresentations of Material Fact

Generally, a party has a duty to take advantage of discovery procedures to fully investigate the facts prior to entry of judgment. (*Stevenot, supra,* 154 Cal.App.3d at pp. 1069–1070.) To set aside a judgment based on "false facts" when the fraud was part of the proceeding itself, a party must show "such facts could not reasonably have been discovered prior to entry of judgment." (*Cartagena, supra,* 35 Cal.App.4th 1061, 1068.)

33

A conservator's presentation of an accounting to the court for approval, however, is not an adversarial proceeding between parties. The conservator is required to account and disclose material information to the conservatee. There is a distinction made "between cases where a plaintiff is under a duty to inquire and those in which he has no such duty until he has notice of facts sufficient to arouse the suspicions of a reasonable man." (*Bennett* v. *Hibernia Bank* (1956) 47 Cal.2d 540, 563 (*Bennett*).) A plaintiff who has no duty to inquire because of a fiduciary relationship does not need to show that he or she could not have discovered the facts earlier with a diligent inquiry. (*Ibid.*)

Once a party actually becomes aware of facts which would make a reasonably prudent person suspicious of wrongdoing by a fiduciary, the party is put on inquiry notice and has a duty to investigate. (*Bennett, supra,* 47 Cal.2d at p. 563; *Alfaro v. Community Housing Improvement System & Planning Assn., Inc.* (2009) 1356, 1394.) At that point, "[a] person with 'actual notice of circumstances sufficient to put a prudent man on inquiry' is deemed to have constructive notice of all facts that a reasonable inquiry would disclose. [Citations.]" (*E-Fab, Inc. v. Accountants, Inc. Services* (2007) 153 Cal.App.4th 1308, 1319.) It is significant, however, that when a fiduciary relationship exists between the parties, facts which would ordinarily require investigation may not excite suspicion and less diligence is required. (*Bennett, supra*, at pp. 559–560.) Therefore, a conservator may show that representations of fact in the account were so obviously false that the conservatee was not justified in relying on them. If the conservatee was not actually aware of facts prior to entry of judgment from which a reasonable person would have suspected wrongdoing, however, the conservatee

34

satisfies the duty of diligence by showing the action to set aside the judgment was filed within the limitations period, as measured from the party's actual discovery of formerly unknown information. (*Id.* at p. 563.)[5]

### D. *Knox*

As he did in the trial court, Foster relies heavily on the legal authority of *Knox, supra*, 205 Cal.App.4th at page 428, for the proposition that a party seeking to set aside a judgment for

---

[5] Several authorities hold that an equitable action to set aside a judgment obtained through extrinsic fraud or mistake is governed by the three-year statute of limitations in Code of Civil Procedure section 338, subdivision (d), including its discovery rule. (*Lightner Mining Co. v. Lane* (1911) 161 Cal. 689, 702; *Lataillade v. Orena, supra*, 91 Cal. at pp. 577–578; *Turner v. Milstein* (1951) 103 Cal.App.2d 651, 659; *Scott v. Dilks* (1941) 47 Cal.App.2d 207, 209–210; *Zastrow v. Zastrow* (1976) 61 Cal.App.3d 710, 714–715 [the weight of California case law applies statutory limitation periods in equitable actions to vacate a judgment].) Although some courts have stated that an equitable action to set aside a judgment based on extrinsic fraud or mistake is not subject to statutory time limits (*Department of Industrial Relations v. Davis Moreno Construction, Inc.* (2011) 193 Cal.App.4th 560, 570–571; *Munoz v. Lopez* (1969) 275 Cal.App.2d 178, 181), even under this view, courts employ the statute of limitations by analogy to measure laches or unreasonable delay in an action to set aside a judgment. (*Vai v. Bank of America* (1961) 56 Cal.2d 329, 343; *Protopappas v. Protopappas* (1963) 213 Cal.App.2d 659, 665; *Barritt v. Barritt* (1933) 132 Cal.App. 538, 544.) An equitable action to set aside a judgment is also subject to a defense of laches. (*Stevenot, supra*, 154 Cal.App.3d at p. 1071.)

extrinsic fraud based on misrepresentations of fact must show the party could not reasonably have discovered the misrepresentations prior to entry of judgment. To the extent that *Knox* may be interpreted to mean that a conservatee with no actual notice of facts that suggest wrongdoing has a duty to conduct an investigation to verify the facts in a conservator's account prior to entry of judgment, we respectfully disagree.

In *Knox*, a successor conservator brought an action against former conservator Lawrence A. Dean II for several causes of action, including elder financial abuse. (*Knox*, *supra*, 205 Cal.App.4th at p.422.) Dean asserted in a summary judgment motion that the probate court orders approving his accountings were conclusive of the matters contained in them. (*Ibid*.) The *Knox* court considered whether the successor's claims were precluded by section 2103, rather than as here whether to exercise the court's equitable power to set aside the orders approving the accounts, but the same principles of extrinsic fraud have been applied in both contexts.

Dean stated in his first accounting that he hired "Girlie Kirbac" as an in-home caregiver for the conservatee and paid her approximately $4,200 for her services. (*Knox*, *supra*, 205 Cal.App.4th at p. 428.) In opposition to summary judgment, the successor conservator provided a declaration from Kirbac stating that she had never met Dean and had not provided any services for the conservatee. (*Ibid*.)

The *Knox* court expressed concern about the accuracy of Dean's representations in the first accounting, but the court concluded that the successor conservator "failed to explain why the first accounting did not provide her sufficient information to investigate a fraud claim at the time. In order to establish the

second type of extrinsic fraud, "'it is insufficient for a party to come into court and simply assert that the judgment was premised on false facts. The party must show that such facts could not reasonably have been discovered prior to the entry of judgment." [(*Cartagena*, *supra*, 35 Cal.App.4th at pp. 1067–1068)]' (*In re Margarita D.* (1999) 72 Cal.App.4th 1288, 1295.) Thus, the fraud, if any, was intrinsic rather than extrinsic (see *Lazzarone*, *supra*, 181 Cal.App.3d at pp. 588–589) and does not provide an exception under Probate Code section 2103, subdivision (b) to the preclusive effect of the order approving the first accounting." (*Knox*, *supra*, 205 Cal.App.4th at p. 428.)

We conclude *Knox* misinterpreted the requirements for establishing extrinsic fraud by a fiduciary that are incorporated in section 2103. Section 2103 clearly states that an order does not operate to release a guardian or conservator when the order is obtained by misrepresentation of material fact in the petition or account. Within the context of a nonfiduciary relationship, misrepresentations of material fact presented in a judicial proceeding are considered intrinsic fraud, but misrepresentations of material fact by a fiduciary constitute extrinsic fraud. Where a conservator has misrepresented a material fact in an account approved by the probate court, a party bringing a subsequent action on behalf of the conservatee does not need to show that the misrepresentation could not have been discovered prior to entry of the order approving the account. (See *Bennett, supra,* 47 Cal.2d at p. 563.)

The *Knox* court relied on *In re Margarita D.*, *supra*, 72 Cal.App.4th at page 1295, for the proposition that a party must show "false facts" could not reasonably have been discovered prior to the entry of judgment. (*Knox*, *supra*, 205 Cal.App.4th at

37

p. 428.)  *In re Margarita D.*, however, concerned a motion to set aside a paternity judgment in a nonfiduciary context.  (*In re Margarita D.*, *supra,* 72 Cal.App.4th at p. 1293.)  *In re Margarita D.* had in turn relied on *Cartagena* which also concerned a paternity judgment and did not involve any statement of fact by a fiduciary.  (*Id.* at p. 1295; *Cartagena*, *supra*, 35 Cal.App.4th at pp. 1066–1068.)

 The *Knox* court's interpretation of section 2103 incorrectly imposes on fiduciary relationships the discovery obligation that applies in non-fiduciary relationships, thereby substantially limiting the protection of section 2103, subdivision (b).  We disagree with *Knox* to the extent it suggests that a conservatee who is not aware of facts suggesting wrongdoing must show the misrepresentations of material fact in a fiduciary's account could not reasonably have been discovered prior to the entry of judgment.

## Application

 In denying Hudson's motion to vacate, the probate court found that Hudson failed to sufficiently describe his knowledge of reimbursements, and as a result, he had not shown that he was unaware of the defects in the final account at the time of its approval.

 The probate court's ruling reflects the incorrect legal standard provided in *Knox*.  The court improperly placed the burden on Hudson to show that he could not have discovered the misrepresentations of material fact in the final account prior to entry of the order.  To the extent the court found Hudson was aware of the defects in the final account at the time it was made,

the finding is not supported by substantial evidence. The probate court focused on Hudson's knowledge of reimbursements, but the entries at issue did not concern reimbursements. The final account included representations that 28 specific checks were paid directly to Hudson's creditors, when in fact those checks were paid to Foster. In response to Hudson's motion to set aside the final account, Foster's explanation was that these checks were reimbursements that were poorly presented in the account as direct payments to creditors, but Hudson showed that at least two of the checks could not even be characterized as mislabeled reimbursements because the creditors did not receive any payment from Foster.

To the extent the probate court further found that Hudson did not act with reasonable diligence to set aside the account based on information that he should have known, the court's ruling did not apply the law governing the diligence of a conservatee asserting extrinsic fraud against his fiduciary. Rather, the court's rational again reflects the incorrect statement of the law made in *Knox.* The court placed a burden on Hudson to scrutinize Foster's account and faulted Hudson for delay in seeking relief based on what he "should have known." We have clarified that Hudson was entitled to rely on the disclosures made by Foster as his conservator and confidant, including after approval of the final account. Hudson's mere access to information did not trigger an obligation to comb through the records to verify the truth of Foster's representations. A correct inquiry into whether Hudson acted diligently would require the court first to determine when Hudson actually discovered formerly unknown information sufficient to put a reasonable person on notice of fraud. We therefore remand the matter to

provide the probate court an opportunity to determine whether Hudson has met the requirements for relief, and if so, whether to exercise its discretion to set aside the final account based on a correct statement of the existing law with respect to fiduciaries.

## DISPOSITION

The order denying the motion to vacate the order approving the conservator's final account is reversed and the matter is remanded for the probate court to exercise its discretion. Appellant Nigel Hudson is awarded his costs on appeal.

MOOR, J.

We concur:

BAKER, Acting P.J.

KIM, J.